David Donahue (DD 5808)
Nicholas Eisenman (NE 0213)
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
(212) 813-5900 (phone)
(212) 813-5901 (fax)

**JUDGE BUCHWALD**

**07 CIV 8353**

Counsel for Plaintiff Universal Music - MGB NA LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

UNIVERSAL MUSIC - MGB NA LLC,

                Plaintiff,

      v.

KILLERSOUND, INC.,

                Defendant.

---

Case No. _____

**COMPLAINT**



## COMPLAINT

Plaintiff Universal Music - MGB NA LLC (f/k/a BMG Music Publishing NA LLC), by

its undersigned attorneys, Fross Zelnick Lehrman & Zissu, P.C., for its Complaint against

defendant Killersound, Inc., alleges as follows:

### NATURE OF THE ACTION

1.     Plaintiff owns and operates the well-known KILLER TRACKS production music

company and has used the KILLER TRACKS trademark in connection with musical sound

recordings, sound effects and production music services for many years.  The KILLER TRACKS

mark is among the best-known marks to consumers in the field of production music; indeed, the

{F0042801.7 }

Trademark Trial and Appeal Board (the "T.T.A.B.") of the United States Patent & Trademark Office (the "U.S.P.T.O.") has held that the mark is "famous."

2.     Long after plaintiff obtained exclusive rights in its KILLER TRACKS mark, defendant adopted and began using the KILLERSOUND trademark and trade name in connection with goods and services that compete directly with those offered by plaintiff.

3.     When defendant sought to register KILLERSOUND (and design) with the U.S.P.T.O., plaintiff promptly took action to block the registration, and succeeded in stopping defendant's blatant efforts to encroach upon plaintiff's trademark rights in KILLER TRACKS. In its decision refusing to register defendant's mark, the T.T.A.B. found that "there is a likelihood that the purchasing public would be confused" by defendant's use of the KILLERSOUND mark in connection with its music-related services.

4.     Notwithstanding the T.T.A.B.'s unambiguous finding that defendant's use of KILLERSOUND was likely to confuse the purchasing public and despite plaintiff's demand that defendant cease and desist its infringing activities, defendant has *expanded* its use of the KILLERSOUND mark.  Plaintiff, thus, brings this action to protect its goodwill and seeks a permanent injunction, an accounting of defendant's profits flowing from its use of the KILLERSOUND mark, damages, attorneys' fees, and such other relief as the Court deems just and proper.

## THE PARTIES

5.     Plaintiff Universal Music - MGB NA LLC (f/k/a BMG Music Publishing NA LLC) is a limited liability company organized and existing under the laws of California, with offices at 245 Fifth Avenue, 8th Floor, New York, New York 10016.

{F0042801.7 }

6.     Upon information and belief, defendant Killersound, Inc. ("Killersound") is a corporation organized and existing under the laws of California with an office and place of business at 101 First Street, Suite 321, Los Altos, California 94022.

## JURISDICTION AND VENUE

7.     The Court has original jurisdiction over the subject matter of this action pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121, and under Sections 1331 and 1338(a) and (b) of the Judicial Code, 28 U.S.C. §§ 1331, 1338(a) and (b).  The Court has supplemental jurisdiction over plaintiff's state law claims under Section 1367(a) of the Judicial Code, 28 U.S.C. § 1367(a).

8.     Upon information and belief, defendant regularly does and solicits business within the State of New York; has engaged in conduct, including, but not limited to, the marketing, promotion, advertising and sale of production music services, musical sound recordings, and sound effects under the KILLERSOUND mark, in this judicial district, causing injury within this district and State; has derived substantial revenues from such conduct within this district and State; and has and should have reasonably expected such conduct to have consequences within this district and State, including, but not limited to, the harm suffered by plaintiff complained of herein.

9.     Venue in this judicial district is proper pursuant to Sections 1391(b) and (c) of the Judicial Code, 28 U.S.C. § 1391(b) and (c), in that a substantial part of the events giving rise to plaintiff's claims, including, but not limited to, defendant's marketing, promotion, advertising, sale and offering for sale production music services, musical sound recordings, and sound effects under the KILLERSOUND mark in violation of plaintiff's exclusive rights in the KILLER

[F0042801.7 ]

TRACKS mark, occurred in this district, and in that defendant is subject to personal jurisdiction

in New York State and is therefore deemed to reside in New York State.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**A.    Plaintiff's Well-Known KILLER TRACKS Mark**

10.    Plaintiff is recognized as a global leader in the field of production music. Its

production music division, which has done business as "Killer Tracks" and offered music-related

goods and services under the KILLER TRACKS mark since the late-1980s, composes, produces,

and licenses original music and sound effects to others for use in connection with (among other

things) television, radio, and internet programming, commercials, company training videos,

websites and multi-media presentations.

11.    Plaintiff's production music and sound effects have appeared in popular television

shows such as *Seinfeld*, *20/20*, *Law & Order* and *The Oprah Winfrey Show*, films such as *The*

*Good Shepherd*, *The Matrix*, *Independence Day* and *Shark Tale*, and in television commercials

for companies and products such as McDonald's, Coca Cola and Campbell's Soup.

12.    Plaintiff's rights in KILLER-formative marks date back to the mid-1980s, when

plaintiff's predecessor-in-interest, Killer Music, began using the KILLER MUSIC name and

mark in connection with its production music business. Soon thereafter, in the late-1980s,

plaintiff adopted the name KILLER TRACKS for its production music business and as a mark

for its goods and services.

13.    Plaintiff's KILLER TRACKS mark appears on compact discs that it distributes to

customers of its production music services, as well as on its advertising, marketing and

promotional materials. A printout from plaintiff's website illustrating its use of its KILLER TRACKS mark in connection with such products and materials is attached as **Exhibit 1**.

14.    Plaintiff spends hundreds of thousands of dollars annually on advertising, marketing and promoting its music-related goods and services under the KILLER TRACKS mark and trade name, and has devoted and continues to devote significant resources to advertise and market the KILLER TRACKS mark and name on or in connection with its goods and services throughout the United States. It advertises in nationally distributed print media, including *The Hollywood Reporter* and various trade publications, and through its own brochures and mailers, which are distributed to consumers each year. Plaintiff also markets its services through sponsorship of music-related events, such as the South by Southwest Music and Media Conference and many others.

15.    Since at least as early as 1997, plaintiff has advertised and prominently displayed its products and services on the www.killertracks.com website. Visitors to plaintiff's www.killertracks.com website can purchase, download and listen to plaintiff's production music and sound effects and learn more about plaintiff and its products and services offered under its KILLER TRACKS mark.

16.    Additionally, since at least as early as 1997, plaintiff has advertised its 1-800-4-KILLER telephone line to further reinforce consumers' association of "KILLER"-formative marks with plaintiff.

17.    Moreover, over the years, plaintiff has expanded its family of KILLER-formative marks by combining the word KILLER with various other words to represent its production music libraries of different genres. Such marks include, without limitation, KILLER LATINO, KILLER EDGE, KILLER FX, KILLER SONIFIER, KILLER ANIMATION, KILLER

{F0042801.7 }

PROMOS, KILLER STAGE & SCREEN, KILLER SCORES, KILLER TOOLS, and KILLER

UNDERGROUND. Plaintiff has promoted each of these marks together with its KILLER

TRACKS mark in connection with its musical sound recordings, music production services and

other related goods and services.

18.    As a result of plaintiff's extensive advertising and sale of goods and services

under the KILLER TRACKS mark and trade name, KILLER TRACKS, when used in

connection with production music services, musical sound recordings, sound effects, and other

related goods and services, has become exclusively associated with plaintiff. Consumers

recognize music-related goods and services bearing the KILLER TRACKS mark as coming from

plaintiff.

19.    In addition to its common law rights in the KILLER TRACKS mark, plaintiff also

owns United States Trademark Registration No. 2,878,147 for the mark KILLER TRACKS in

International Class 9 in connection with "musical sound recordings," and in International Class

41 for "providing music for use in production of television shows, television advertisement,

motion pictures, video recordings, in-house production, and multi media applications; music

publishing services; providing information about and performances of musical artists by means

of a global computer information network" (the "KILLER TRACKS Registration"). The

KILLER TRACKS Registration is valid, subsisting and in full force and effect and constitutes

prima facie evidence of plaintiff's exclusive right to use the KILLER TRACKS mark in

connection with the goods or services identified therein. A copy of the KILLER TRACKS

Registration, along with a printout from the PTO's website illustrating the chain of title, is

attached as **Exhibit 2**.

**B.    Defendant's Infringing Activity**

20.    Defendant has never been associated or affiliated with plaintiff in any way, nor has plaintiff ever authorized, licensed or consented to defendant's conduct complained of herein.

21.    Long after plaintiff obtained exclusive rights in its KILLER TRACKS mark, defendant adopted and began using the KILLERSOUND mark and "Killersound" trade name in connection with the very goods and services that plaintiff offers—production music services, musical sound recordings, and sound effects.

22.    In connection with such activities, defendant prepares and distributes advertising and other materials that prominently display the KILLERSOUND mark and is marketing, advertising and promoting its goods and services on the www.killersound.com website, which is accessible to consumers throughout the United States, including in New York State. A printout of the home page of defendant's www.killersound.com website, on which defendant's infringing KILLERSOUND mark is prominently displayed in connection with production music services, is attached as **Exhibit 3**.

23.    Upon information and belief, defendant is selling goods and services under the KILLERSOUND mark to the same customers to whom plaintiff markets and sells its goods and services under its KILLER TRACKS mark.

**C.    The T.T.A.B. Ruled in Plaintiff's Favor that Defendant's Use of KILLERSOUND Will Confuse Consumers**

24.    Despite plaintiff's prior rights in the KILLER TRACKS mark for production music services, musical sound recordings, sound effects, and related goods and services, defendant filed U.S. Trademark Application Serial No. 75/702,568 seeking to register KILLERSOUND (and design) for "music composition for others" in International Class 41.

Defendant filed the application based on its alleged "intent to use" the mark under Section 1(b) of the Lanham Act, 15 U.S.C. § 1051(b). Defendant, however, did not state a date of first use in commerce.

25.    To protect its exclusive rights in its KILLER TRACKS mark, plaintiff filed an opposition proceeding before the T.T.A.B. against defendant's registration of the KILLERSOUND mark on the ground that it so closely resembles plaintiff's KILLER TRACKS mark as to be likely to cause confusion and/or cause mistake, or deceive consumers as to the source, sponsorship or approval of defendant's services, and to cause consumers to believe that defendant's services are sponsored by, affiliated with, approved by or otherwise connected with plaintiff (the "T.T.A.B. Proceeding").

26.    The T.T.A.B. sustained plaintiff's opposition and rejected defendant's application to register KILLERSOUND. *Killer Music, Inc. v. Killersound, Inc.*, Opposition No. 91152646 (T.T.A.B. March 22, 2005) (Unpublished). A true and correct copy of the T.T.A.B.'s decision is attached as **Exhibit 4**.

27.    In sustaining plaintiff's opposition to defendant's application to register KILLERSOUND, the T.T.A.B. held, *inter alia*, that (i) plaintiff's first use of the KILLER TRACKS mark was "prior to the filing date of applicant's intent-to-use based application," **Ex. 4** at 13, (ii) plaintiff's "mark KILLER TRACKS is famous, and is thus entitled to a broad scope of protection," *id.* at 27, and (iii) "there is a likelihood that the purchasing public would be confused when applicant uses KILLERSOUND and design as a mark for its services," *id.* at 29.

**D.    Despite Its Loss in the T.T.A.B. Proceeding Defendant Has Willfully Refused to Stop Using the KILLERSOUND Mark**

28.    Instead of stopping its use of the KILLERSOUND mark in light of the T.T.A.B.'s finding that consumers would be confused, defendant instead has expanded its use of the KILLERSOUND mark.

29.    When plaintiff learned that defendant still was using the KILLERSOUND mark notwithstanding the T.T.A.B.'s decision, its counsel sent defendant a cease and desist letter, demanding that it stop using the KILLERSOUND mark.

30.    Defendant refused to stop its use of the KILLERSOUND mark and to this day is blatantly offering goods and services under the KILLERSOUND mark that directly compete with the goods and services plaintiff offers under its KILLER TRACKS mark.

31.    Given defendant's indisputable knowledge of plaintiff's KILLER TRACKS mark, and its loss in the T.T.A.B. Proceeding, the only conclusion that can be drawn is that Defendant's use of a mark that so closely resembles plaintiff's KILLER TRACKS mark is consciously designed to confuse the relevant consuming public, and to unfairly siphon off plaintiff's customers.

32.    Indeed, defendant's use of KILLERSOUND in connection with the very production music services, musical sound recordings, sound effects, and related goods and services that plaintiff offers (i) is intentionally fraudulent, malicious, willful and wanton, (ii) unfairly and unlawfully wrests from plaintiff control over its reputation, and (iii) unjustly enriches defendant.

33.    Defendant's unauthorized acts as described herein have caused and will continue to cause irreparable damage to plaintiff's business and goodwill unless restrained by this Court.

{F0042801.7 }

34.    Plaintiff has no adequate remedy at law.

## FIRST CLAIM FOR RELIEF
## TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1))

35.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 34 above as if fully set forth herein.

36.    Defendant's KILLERSOUND mark, when used in connection with production music services, musical sound recordings, sound effects, and related goods and services, is such a close variation of plaintiff's federally registered KILLER TRACKS mark as to be considered identical or substantially similar.

37.    Defendant's unauthorized use of the KILLERSOUND mark is likely to cause confusion, cause mistake, or deceive consumers as to the source, sponsorship or approval of defendant's goods and services and, specifically, to cause consumers to believe that defendant's goods and services are sponsored by, affiliated with, approved by or otherwise connected with plaintiff.

38.    Defendant's acts constitute infringement of plaintiff's federally registered KILLER TRACKS mark in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

39.    Defendant's conduct has caused and is causing immediate and irreparable injury to plaintiff.

## SECOND CLAIM FOR RELIEF
## FEDERAL UNFAIR COMPETITION (15 U.S.C. § 1125(a))

40.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 39 above as if fully set forth herein.

41.     Defendant's use of the KILLERSOUND mark and its conduct complained of herein constitutes a false designation of origin and a false representation as to the origin of defendant's goods and services, is likely to cause confusion, mistake, or deception as to the source of defendant's services, and is likely to create the false impression that defendant's goods and services are authorized, sponsored, endorsed, licensed by, or affiliated with plaintiff.

42.     Defendant's actions constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

43.     Defendant's conduct has caused and is causing immediate and irreparable injury to plaintiff.

<div align="center">

THIRD CLAIM FOR RELIEF
UNFAIR COMPETITION UNDER NEW YORK COMMON LAW

</div>

44.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 43 above as if fully set forth herein.

45.     Defendant's conduct complained of herein is likely to confuse the public as to the origin, source or sponsorship of defendant's services, or to cause mistake or to deceive the public into believing that defendant's services are authorized, sponsored, endorsed, licensed by, or affiliated with plaintiff, in violation of plaintiff's rights in the KILLER TRACKS mark under New York State common law.

46.     Upon information and belief, defendant chose to use the KILLER TRACKS mark with constructive and/or actual knowledge of plaintiff's prior use of and rights in the KILLER TRACKS mark in connection with production music services, musical sound recordings, sound effects, and related goods and services.  By adopting and using a colorable imitation of the

{F0042801.7 }

valuable and distinctive KILLER TRACKS mark, defendant has been unjustly enriched and

plaintiff has been damaged.

<div align="center">

FOURTH CLAIM FOR RELIEF
VIOLATION OF THE NEW YORK DECEPTIVE
AND UNFAIR TRADE PRACTICES ACT
(N.Y. General Business Law § 349)

</div>

47.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 46

above as if fully set forth herein.

48.    Defendant's use of the KILLERSOUND mark has the capacity to deceive and is

deceiving the public as to the source of sponsorship of defendant's goods and services. As a

result, the public will be damaged.

49.    Defendant's conduct is willful and in knowing disregard of plaintiff's rights.

50.    Defendant has been and is engaged in deceptive acts or practices in the conduct of

a business, trade or commerce in violation of Section 349 of the New York General Business

Law.

51.    Defendant's conduct has caused and is causing immediate and irreparable injury

to plaintiff.

<div align="center">

FIFTH CLAIM FOR RELIEF
TRADEMARK DILUTION UNDER
NEW YORK LAW (N.Y. General Business Law § 360-l)

</div>

52.    Plaintiff repeats and realleges paragraphs 1 through 51 of this Complaint as if

fully set forth herein.

53.    Plaintiff's KILLER TRACKS mark is distinctive and acquired distinctiveness

prior to defendant's first use of the KILLERSOUND Mark.

{F0042801.7 }

-12-

54.    Defendant's unauthorized use of the KILLERSOUND mark is diluting and is likely to continue diluting plaintiff's KILLER TRACKS mark by blurring the distinctiveness thereof, and is likely to injure and has injured plaintiff's business reputation, all in violation of Section 360-*l* of the General Business Law of the State of New York.

55.    Defendant's unauthorized acts as described herein have caused and will continue to cause irreparable damage to plaintiff.

WHEREFORE, plaintiff Universal Music - MGB NA LLC respectfully demands judgment as follows:

(1) That a permanent injunction be issued enjoining defendant, its officers, agents, directors, shareholders, principals, licensees, distributors, attorneys, servants, employees, affiliates, subsidiaries and assigns, and all those persons in concert or participation with any of them from:

(a)    using the KILLERSOUND mark in connection with the advertising, promotion, manufacture, production, importation, distribution, displaying, sale or offering for sale of musical sound recordings and sound effects, or in connection with the advertising, promotion, sale or offering for sale of production music, music publishing, and music information services;

(b)    using the KILLER TRACKS mark, or any mark that includes KILLER in whole or in part, or a phonetic equivalent or misspelling thereof, or any other simulation, reproduction, copy, colorable imitation or confusingly similar variation of the KILLER TRACKS mark, in connection with the advertising, promotion, manufacture, production, importation, distribution, displaying, sale or offering for

{F0042801.7 }

sale of musical sound recordings and sound effects, or in connection with the
advertising, promotion, sale or offering for sale of production music, music
publishing, and music information services;

(c)    conducting any activities in the United States that relate to, refer to or
concern the advertising, promotion, manufacture, production, importation,
distribution, displaying, sale or offering for sale of musical sound recordings and
sound effects, or in connection with the advertising, promotion, sale or offering for
sale of production music, music publishing, and music information services, under
the KILLERSOUND mark or any mark that includes KILLER in whole or in part,
or is a phonetic equivalent or misspelling thereof, or that is a simulation,
reproduction, copy, colorable imitation or confusingly similar variation of the
KILLER TRACKS mark;

(d)    using any false designation of origin or false description (including,
without limitation, any letters or symbols), or performing any act, which can, or is
likely to, lead members of the trade or public to believe that any goods
manufactured, imported, advertised, promoted, distributed, displayed, produced,
sold or offered for sale by defendant, or any services advertised, promoted, sold or
offered for sale by defendant, are in any manner associated or connected with
plaintiff, or are authorized, licensed, sponsored or otherwise approved by
plaintiff;

(e)    engaging in any other activity constituting unfair competition with
plaintiff, or constituting an infringement of the KILLER TRACKS mark;

(f)    applying to register or registering in the United States Patent and

Trademark Office or in any state trademark registry any mark consisting in whole or in part of the word KILLERSOUND or consisting in whole or in part of any simulation, reproduction, copy or colorable imitation of the KILLER TRACKS mark, for musical sound recordings, sound effects, production music services, music publishing services, music information services or any goods or services related to the foregoing;

(g)    diluting or tarnishing plaintiff's KILLER TRACKS mark;

(h)    incorporating under, doing business under or seeking to trade under any business name that includes the term "KILLER" in the United States;

(i)    using any domain name or metatag that includes in whole or in part the term "KILLER" or any formative thereof, including, without limitation, the domain name killersound.com, in connection with a web site that advertises, promotes, markets, displays, sells or offers for sale or otherwise refers to musical sound recordings, sound effects, production music services, music publishing services, music information services or any goods or services related to the foregoing;

(j)    owning, renting, purchasing or otherwise obtaining rights to any internet search term that includes in whole or in part the term "KILLER" or any formative thereof for purposes of directing internet traffic to any web site that advertises, promotes, displays or otherwise refers to musical sound recordings, sound effects, production music services, music publishing services, music information services or any goods or services related to the foregoing;

(k)    assisting, aiding or abetting any other person or business entity in

engaging in or performing any of the activities referred to in subparagraphs (a)

through (j) above;

(2)     Directing defendant to deliver up to plaintiff's attorneys for destruction all goods,

labels, tags, signs, stationery, prints, packages, promotional and marketing materials,

advertisements and other materials (a) currently in its possession or under defendant's control, or

(b) recalled by defendant pursuant to any order of the Court or otherwise, incorporating,

featuring or bearing the KILLERSOUND mark or any other simulation, reproduction, copy or

colorable imitation of the KILLER TRACKS mark in connection with musical sound recordings,

sound effects, production music services, music publishing services, music information services

or any goods or services related to the foregoing;

(3)     Directing such other relief as the Court may deem appropriate to prevent the

public from deriving the erroneous impression that any product manufactured, imported,

advertised, promoted, distributed, displayed, produced, sold or offered for sale, or any service

advertised, promoted, sold or offered for sale by defendant is in any manner authorized by

plaintiff or related in any way to plaintiff;

(4)     Directing defendant to file with the Court and serve upon plaintiff's counsel

within thirty (30) days after entry of judgment a report in writing under oath, setting forth in

detail the manner and form in which it has complied with the above;

(5)     Awarding plaintiff such damages it has sustained or will sustain by reason of

defendant's acts of trademark infringement and unfair competition and that such sums be trebled

pursuant to 15 U.S.C. § 1117;

(6)     Awarding plaintiff all gains, profits, property and advantages derived by

defendant from defendant's unlawful conduct;

(7)    Awarding to plaintiff exemplary and punitive damages to deter any further willful

infringement as the Court finds appropriate;

(8)    Awarding to plaintiff its costs and disbursements incurred in this action, including

reasonable attorneys' fees pursuant to 15 U.S.C. §1117(a);

(9)    Awarding to plaintiff interest, including pre-judgment interest on the foregoing

sums; and

(10)    Awarding to plaintiff such other and further relief as the Court may deem just and

proper.

Dated:    New York, New York           Respectfully submitted,
          September 24, 2007

                                        FROSS ZELNICK LEHRMAN &
                                        ZISSU, P.C.

                                By:     _____
                                        David Donahue (DD 5808)
                                        Nicholas Eisenman (NE 0213)

                                        866 United Nations Plaza
                                        New York, New York 10017
                                        (212) 813-5900

                                        Attorneys for Plaintiff

# EXHIBIT 1

http://killertracks.com/launchpage/KillerTracks/



 The Killer Tracks Website utilizes Flash.  You must have the latest Adobe Flash Player installed to view it correctly. Please visit the Adobe Website to download the Flash Player.

 The Killer Tracks Website also utilizes pop-up windows.  If you have a pop-up blocker installed, please disable it or add our website to your allowed list.

4:50:52 PM 9/19/2007

# EXHIBIT 2

Int. Cls.: 9 and 41

Prior U.S. Cls.: 21, 23, 26, 36, 38, 100, 101 and 107

**United States Patent and Trademark Office**

Reg. No. 2,878,147
Registered Aug. 31, 2004

## TRADEMARK
## SERVICE MARK
### PRINCIPAL REGISTER

## KILLER TRACKS

KILLER MUSIC, INC. (CALIFORNIA CORPORA-
TION)
30 KEWEN PLACE
SAN MARINO, CA 91108

FOR: MUSICAL SOUND RECORDINGS, IN
CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 2-0-1990; IN COMMERCE 2-0-1990.

FOR: PROVIDING MUSIC FOR USE IN PRODUC-
TION OF TELEVISION SHOWS, TELEVISION AD-
VERTISEMENTS, MOTION PICTURES, VIDEO
RECORDINGS, IN-HOUSE PRODUCTIONS, AND
MULTI MEDIA APPLICATIONS; MUSIC PUBLISH-
ING SERVICES; PROVIDING INFORMATION
ABOUT AND PERFORMANCES OF MUSICAL AR-

TISTS BY MEANS OF A GLOBAL COMPUTER
INFORMATION NETWORK, IN CLASS 41 (U.S.
CLS. 100, 101 AND 107).

FIRST USE 11-0-1995; IN COMMERCE 11-0-1995.

OWNER OF U.S. REG. NO. 1,466,219.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "TRACKS" , APART FROM THE
MARK AS SHOWN.

SER. NO. 76-053,099, FILED 5-22-2000.

BARBARA A. LOUGHRAN, EXAMINING ATTOR-
NEY



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | *eBusiness* | eBiz alerts | News | Help



**Assignments on the Web** > Trademark Query

# Trademark Assignment Abstract of Title

**Total Assignments: 3**

Serial #: 76053099    Filing Dt:    Reg #: 2878147    Reg. Dt:

Mark:

## Assignment: 1

Reel/Frame: 2704/0991    Received: 08/22/2003    Recorded: 08/22/2003    Pages: 7

Conveyance: ASSIGNS THE ENTIRE INTEREST

Assignor: KILLER MUSIC, INC.    Exec Dt: 08/07/2003
    Entity Type: CORPORATION
    Citizenship: CALIFORNIA

Assignee: BMG SONGS, INC.    Entity Type: CORPORATION
8750 WILSHIRE BOULEVARD    Citizenship: CALIFORNIA
BEVERLY HILLS, CALIFORNIA 90211

Correspondent: COWAN, LIEBOWITZ & LATMAN, P.C.
MARY L. KEVLIN, ESQ.
1133 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-6799

## Assignment: 2

Reel/Frame: 2965/0849    Received: 10/27/2004    Recorded: 10/27/2004    Pages: 3

Conveyance: CHANGE OF NAME

Assignor: BMG SONGS, INC.    Exec Dt: 07/30/2004
    Entity Type: CORPORATION
    Citizenship: CALIFORNIA

Assignee: BMG MUSIC PUBLISHING NA, INC.    Entity Type: CORPORATION
1540 BROADWAY    Citizenship: CALIFORNIA
NEW YORK, NEW YORK 10036

Correspondent: FROSS ZELNICK LEHRMAN & ZISSU, P.C.
LAWRENCE ELI APOLZON
866 UNITED NATIONS PLAZA
NEW YORK, NY 10017

## Assignment: 3

Reel/Frame: 3552/0121    Received: 05/31/2007    Recorded: 05/31/2007    Pages: 3

Conveyance: CORPORATE CONVERSION

Assignor: BMG MUSIC PUBLISHING NA, INC.    Exec Dt: 12/14/2006
    Entity Type: CORPORATION
    Citizenship: CALIFORNIA

Assignee: BMG MUSIC PUBLISHING NA LLC    Entity Type: LIMITED LIABILITY COMPANY
245 FIFTH AVENUE    Citizenship: CALIFORNIA
8TH FLOOR
NEW YORK, NEW YORK 10001

Correspondent: LAWRENCE ELI APOLZON
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 UNITED NATIONS PLAZA
NEW YORK, NY 10017

Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX| SEARCH | *e*BUSINESS | CONTACT US | PRIVACY STATEMENT

# EXHIBIT 3

http://www.killersound.com/amazon2_si-bin/killersound.storefront

# killersound

- site navigation -

Home | Custom Services | Products | Log In | My Cart | Bookmarks | Help | Contact Us | Tech Center | Clients | Partners | Overview

## killersound

take a tour

## music and sound design for new media

royalty-free    customizable    world-class    remixable

**Search for Music**

[        ] GO

type any word or ID#

**Advanced Search**

**Halloween Picks**

**Hot Picks - Save $$**

**Hot Shots**

**New Releases**

**Loops**
» Compilations
» Single

**Re-Mixable Library**
» Classical
» Electronica
» Jazz
» Kids
» Light Sounds
» Mood/Ambient
» Pop/Urban
» Rock
» Techno
» World

**S O U N D F X**
» Single CD Sets
» Multi CD Sets
» Downloadable

**M U L T I M E D I A**
» Bigshot Bundles

**Tips & Tutorials**

**Free Stuff**

**View Intro**

killersound licenses royalty-free, original music and sound for use in all media. Our audio is delivered in components (or building blocks) for the ultimate freedom, giving you the option to remix the music to fit the visuals in any project.

...more

killersound also creates, produces and delivers audio & visual content for wireless devices including 3GPP video and Flash Lite content.

...more

search    listen    license    download

click the images to use **SoundScan** our music preview tool



classical    electronica



jazz    kids



light    mood    pop/urban




rock    techno



world

### SoundSet demo...

E0153_4_140_6
SoundSet

| File Name | Size | Dur. |
|---|---|---|
| E0153bass | 614 KB | 2 sec |
| E0153drums | 307 KB | 1 sec |
| E0153electro | 307 KB | 1 sec |
| E0153synth | 614 KB | 2 sec |



Timeline

| | | 1 | 5 | 10 | 15 | 20 |
|---|---|---|---|---|---|---|
| Layer 1 - bass | | E0153drums E0153bass | | | | |
| Layer 2 - drums | | | | | | |
| Layer 3 - electro | | | | | | |
| Layer 4 - synth | | | | | | |

### In the News...

**killersound is wireless!!!** Do you have a Sprint phone? Download animated ringtones with killersound audio... Titles include Dick Tracy, Ziggy, Garfield and many others.

Flash is mobile!!! killersound is using the latest technology from Adobe to develop FlashLite content for mobile devices. Contact us if you want to make your content go wireless!

Now you can license many of our loops individually! Choose from a variety of selections for $9.99 each.


Copyright 2000-2007 killersound, Inc. - K I L L T H E S I L E N C E ®
Contact Us | Privacy Policy | Terms of Use | License Agreement | FAQ | Become a Member

4:59:04 PM 9/19/2007

# EXHIBIT 4

THIS DISPOSITION IS NOT
CITABLE AS PRECEDENT OF
THE TTAB

Mailed:  March 22, 2005

**UNITED STATES PATENT AND TRADEMARK OFFICE**
————

**Trademark Trial and Appeal Board**
————

Killer Music, Inc. and BMG Songs, Inc., dba Killer Tracks[1]
v.
killersound, Inc.
————

Opposition No. 91152646
to application Serial No. 75702568
filed on May 11, 1999
————

Mary L. Kevlin of Cowan, Liebowitz & Latman, P.C. for Killer
Music, Inc. and BMG Songs, Inc.

Ian K. Boyd of Harvey Siskind Jacobs LLP for killersound,
Inc.
————

Before Chapman, Bucher and Holtzman, Administrative
Trademark Judges.

Opinion by Chapman, Administrative Trademark Judge:

        Applicant, killersound, Inc. (a California

corporation), filed an application to register on the

Principal Register the mark shown below

---

[1] The notice of opposition includes two named opposers and
opposers' cover letter refers to an enclosed check and a deposit
account for any insufficient or additional fees.  The Board
instituted the opposition with only "Killer Music, Inc." as the
opposer.  That is hereby corrected and both opposers are listed
in the caption of this proceeding.  (The additional fee for the

Opposition No. 91152646



for services identified as "music composition for others" in
International Class 41.  The application is based on
applicant's assertion of a bona fide intention to use the
mark in commerce.

   The application has been opposed by Killer Music, Inc.
(a California corporation) (hereinafter "Killer Music") and
BMG Songs, Inc. (a California corporation) (hereinafter
"BMG") on the basis that for many years both opposers have
marketed "musical and video recordings, providing music for
television, films, videos and multi-media works, music
publishing and musical information services, under the marks
KILLER MUSIC and/or KILLER TRACKS" (paragraph 1); that
Killer Music owns (i) Registration No. 1466219 issued
November 24, 1987 for the mark shown below



("music" disclaimed) for "prerecorded audio and video tapes"
in International Class 9, and (ii) application Serial No.
76053099 filed May 22, 2000 for the mark KILLER TRACKS

---

second opposer has been charged to opposers' law firm's deposit
account.)

Opposition No. 91152646

("tracks" disclaimed) for "musical sound recordings" in
International Class 9 and "providing music for use in
production of television shows, television advertisements,
motion pictures, video recordings, in-house productions, and
multi media applications; music publishing services;
providing information about and performances of musical
artists by means of a global computer information network"
in International Class 41; that BMG is the exclusive
licensee of the KILLER TRACKS mark; that since long prior to
applicant's application filing date, opposers have
extensively advertised and promoted the sale of their goods
-- musical sound recordings, and their provision of services
-- production music services, music publishing services and
music information services under the "KILLER Marks"; that
opposers have built up highly valuable goodwill for their
"KILLER Marks"; and that applicant's mark, when used in
connection with its "music composition for others" services,
so resembles opposers' previously used and registered marks,
as to be likely to cause confusion, mistake, or deception.

In its answer applicant denies the salient allegations
of the notice of opposition and asserts the affirmative
defenses of laches, waiver, estoppel and acquiescence
(paragraphs 3-6).[2]

---

[2] In its brief (p. 3), applicant stated that the issue before the
Board is whether there is a likelihood of confusion when the
involved marks are used on or in connection with the involved

Opposition No. 91152646

The record consists of the pleadings; the file of applicant's application; opposers' testimony, with exhibits, of Gary Gross, president of opposer BMG; and opposers' notices of reliance on the following items:  (1) a status and title copy of opposers' pleaded Registration No. 1466219, and a certified copy of opposers' pleaded application Serial No. 76053099, (2) applicant's amended responses to opposers' first set of interrogatory Nos. 2, 6, 7, 11, 14 and 16 and the documents identified therein,[3] (3) applicant's responses to opposers' requests for admission Nos. 6-9 and the documents identified therein, and (4) copies of numerous publications under Trademark Rule 2.122(e).  Applicant submitted the testimony, with exhibits,

---

goods and services.  Applicant made no reference in its brief to any of its pleaded affirmative defenses, except on page 7, applicant argued that opposers sent a cease and desist letter to applicant on May 22, 2000; that applicant responded in a letter dated June 1, 2000; and that, thereafter opposers did not contact applicant for two years when they filed the opposition in July 2002.  (See Gelat dep., pp. 93-95, Exh. No. 17.)  To whatever extent applicant intends thereby to assert its affirmative defenses, we find that the evidence of record is insufficient to establish any of applicant's pleaded affirmative defenses -- laches, waiver, estoppel and acquiescence.  With specific regard to the defense of laches, see National Cable Television Association, Inc. v. American Cinema Editors, Inc., 937 F.2d 1572, 19 USPQ2d 1424 (Fed. Cir. 1991).

We note that applicant's "affirmative defenses" also include an assertion that opposers' pleading fails to state a claim (paragraph 1).  Applicant did not pursue this defense either before trial by motion to dismiss or after trial in its brief. Applicant has waived this defense.  (Moreover, the notice of opposition states a claim.)  Applicant also pleads certain "defenses" which relate more to a further denial of opposers' assertion of a likelihood of confusion (paragraphs 2, 7 and 8). These are not "affirmative defenses" and will not be treated as such.

Opposition No. 91152646

of Frank Gelat, applicant's president and creative director;
and a notice of reliance under Trademark Rule 2.122(e) on
printouts from the USPTO's Trademark Electronic Search
System (TESS) of five third-party registrations and one
third-party application.

Both parties filed briefs on the case.  Neither party
requested an oral hearing.

Gary Gross, BMG's president, explains that opposers are
in the business of producing and licensing music and other
audio components for customers.  This is known as the
"production music" business.  It involves analyzing the
market needs for various types of music/sounds used in
various types of productions (e.g., television programming
and advertising, films, commercials, company training
videos), and then producing the music or sounds needed and
licensing them to customers for their needs.  In addition to
production music, opposers also engage in music publishing,
which means they own the copyrights for certain music and
act as publisher for those compositions.

Opposers organize the music into several libraries or
brands (e.g., KILLER TRACKS, KILLER CLASSICAL, KILLER
LATINO, KILLER PROMOS, KILLER FX, KILLER ANIMATION) and
within each of the libraries, there are sub categories by
genre (e.g., classical, rock, jazz, hip-hop, trip-hop).

---

[3] Applicant's answers to opposers' interrogatory Nos. 6 and 7

Opposition No. 91152646

Opposers distribute the music (or other sounds) to customers primarily via CD but also do so through the Internet. (Gross dep., p. 6.)

Customers can either order from opposers' preexisting catalog of music or opposers will create custom music for customers.  Rearrangements of the music/sounds by the customers is not allowed without prior permission, but customers can remix the musical instruments in the compositions.  (Gross dep., p. 89.)  Opposers' customers include "almost every major film studio," "almost every major television broadcaster," "advertising agencies" and a wide range of companies from Fortune 500 corporations to "mom-and-pop companies."  (Gross dep., pp. 10-11.)

Customers pay for opposers' goods and services based on the manner in which they use the music.  For example, using the production music in a national television show costs one rate, while using it on a local radio program is another rate.

The mark, KILLER TRACKS, is not only the dba name of opposer BMG, it is the name of a major library of opposers' production music, and has been in use for opposers' production music since 1990.  As of 2003, opposer BMG owns both the KILLER MUSIC and design and KILLER TRACKS marks, when BMG purchased the assets of opposer Killer Music, Inc.,

---

were filed under seal as confidential.

Opposition No. 91152646

including the trademarks, the musical compositions, the archives, etc. (Gross dep., pp. 41-43.)

Opposers' sales of their goods and services offered under the KILLER TRACKS mark from 1997 - 2003 totaled about $52.5 million, with advertising/promotional expenses during that time of $300,000 - $350,000 annually. Opposers' marks, KILLER TRACKS and KILLER MUSIC and design, used in connection with production music services, music entertainment services, music publishing services, music library services and music products, have been the subject of many articles in the relevant publicly circulated media since the late 1980s.

Opposers advertise in trade publications (e.g., "Post Magazine," "TV and Radio Reports," "Hollywood Reporter") and through direct mail, on the Internet, and by exhibiting at trade shows. Opposers generally request or require that they be given a music title credit in the movies and television shows which utilize their goods or services.

Opposers are not aware of any instances of actual confusion.

Applicant, killersound, Inc., was founded in April 1999, following a positive response to the music composed by one of applicant's founders in connection with a colleague's website. Applicant employs two people, Mr. Frank Gelat and Mr. Brett Yokum. Applicant offers a variety of about 500

Opposition No. 91152646

"SoundSets" (i.e., actual compositions) which contain both a
pre-made short (about 10-15 seconds long) and a long
(generally 40-45 seconds) version; and the "SoundSet" can
also be the components or elements or instrument parts
whereby the customer can rearrange, remix or recompose the
music to fit whatever production they are doing. (For
example, a customer might change the pitch or the tempo of
the various components or match another piece of music they
are doing in their production.) Applicant also offers music
loops and sound loops (usually 3 to 20 seconds long), sound
effects and sound logos or signatures. Applicant's online
music libraries are subdivided by genre (e.g., classical,
jazz, mood, pop, rock, techno). Applicant also creates
custom-made products for customers.

Applicant's customers include advertising agencies,
corporations, multimedia artists, freelance designers and
video designers.

The customers may download samples of a composition for
a free trial. When purchasing applicant's services, the
cost averages around $375 per license, except the average
cost for a custom composition is $1500 to $2000.[4]
Applicant markets and delivers its product through its

---

[4] These cost figures were filed during trial under seal as
confidential. However, applicant included the numbers in its
brief (pp. 5 and 12), and its brief was not filed (in relevant
part) under seal as confidential. Thus, applicant waived the
confidentiality of this information.

**Opposition No. 91152646**

website.  That is, once the customer goes through the

purchasing transaction, then the customer downloads the

product to their desktop.  Although applicant has on very

rare occasions (about four or five times) provided a

Opposition No. 91152646

customer with a CD.  The general length of time between customer inquiry and customer purchase is a week or week and a half, except for custom orders which would be one to two months, all with much contact with the client.  Applicant requires that the customer sign a license agreement, and pay a one-time flat fee, without reporting usage to applicant.

Applicant offers some of its services (excluding its SoundSets) through third-parties, specifically, soundeffects.com, buycreative.com, bigshotmedia.com and mediabakery.com.  Also, applicant offers its services bundled in third-party software programs (e.g., Macromedia Flash software and Adobe Live Motion).

Applicant's gross revenues were also filed as confidential and cannot be stated here.  Suffice it to say, its accumulated gross revenues for the years 2000 – 2003 do not reach into the millions of dollars; and its advertising expenses are a very small percentage of its revenues.

Mr. Frank Gelat created the word mark "killer sound" inspired by the positive feedback from his first project of music for a colleague's website.  The logo portion of the mark was created by his co-founder, Brett Yokum.  Frank Gelat did not know Mr. Yokum's inspiration for that design.

Applicant's website receives about 20,000 hits per month.  Applicant attends trade shows (e.g., FlashForward, MacWorld), mails out brochure advertisements to customers

**Opposition No. 91152646**

and potential customers, and has appeared on third-party

websites (e.g., the "Hot News" section of Apple's website).

When Mr. Gelat was asked if applicant had experienced

any actual confusion, he testified that he knew of only one

instance which occurred in September or October 2003.[5]

Specifically, Mr. Gelat testified that an existing customer

of applicant who had licensed a product from applicant, e-

mailed a request to try several products, which applicant

determined were products from opposers' KILLER TRACKS site.

He also testified that he knew of three instances when

consumers called applicant inquiring whether applicant was

related to or affiliated with opposers.  All occurred in the

same time frame, September/October 2003.  One call was from

a distributor of music libraries wondering if applicant was

affiliated with KILLER TRACKS and wanting to do business

with applicant; the other two callers wanted general

information about the products and services.  None of

applicant's business partners or resellers have ever

reported any instance of actual confusion to applicant.

## **Priority**

Opposers made of record a status and title copy of

pleaded Registration No. 1466219 for the mark KILLER MUSIC

---

[5] According to applicant's answer to opposers' interrogatory No.
11, the incident occurred in October 2003.

Opposition No. 91152646

and design for "prerecorded audio and video tapes."[6]  With

regard to the second pleaded mark KILLER TRACKS, after

trial, but before the briefing of this case, the pleaded

application Serial No. 76053099 issued on August 31, 2004 as

Registration No. 2878147.  Opposers specifically referred to

this second registration in their brief on the case (e.g.,

brief, pp. 3 and 4).  Applicant acknowledged that opposers'

pleaded application had registered, referring to it as the

"then-pending application for KILLER TRACKS mark" (brief, p.

2).  Further, applicant made no objection to opposers'

reference to the subsequent registration of the pleaded

application for the mark KILLER TRACKS.  Moreover, there is

clear testimony that BMG purchased the KILLER MUSIC and

design mark and the KILLER TRACKS mark in 2003, thus making

title to the second (recently issued) registration clear.

(Gross, dep., p. 41.)

     Based on the above, we conclude that opposers'

Registration No. 2878147 (issuing from pleaded application

Serial No. 76053099) for "musical sound recordings" and

"providing music for use in production of television shows,

television advertisements, motion pictures, video

recordings, in-house productions, and multi media

applications; music publishing services; providing

---

[6] Registration No. 1466219 issued November 24, 1987; Section 8
affidavit accepted.  The word "music" is disclaimed.  The claimed

**Opposition No. 91152646**

information about and performances of musical artists by
means of a global computer information network"[7] is properly
of record.

    In view of opposer BMG's ownership of valid and
subsisting registrations for its KILLER MUSIC and design and
KILLER TRACKS marks, the issue of priority does not arise in
this opposition proceeding.  See King Candy Co. v. Eunice
King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108, 110 (CCPA
1974); Massey Junior College, Inc. v. Fashion Institute of
Technology, 492 F.2d 1399, 181 USPQ 272, at footnote 6 (CCPA
1972); and Carl Karcher Enterprises, Inc. v. Stars
Restaurants Corp., 35 USPQ2d 1125, 1128 (TTAB 1995).
Moreover, opposers' have established use of the marks KILLER
MUSIC and design and KILLER TRACKS prior to the filing date
of applicant's intent-to-use based application, May 11,
1999.  The record shows that applicant commenced use of its
mark for "custom audio services" in April 1999.  (See, e.g.,
applicant's answer to opposers' interrogatory No. 2.)
Opposers' proven first use of their two pleaded marks is
prior to applicant's proven first use date.

---

dates of first use anywhere and first use in commerce are March
1984 and June 1984, respectively.
[7] Registration No. 2878147 issued August 31, 2004.  The word
"tracks" is disclaimed.  The claimed dates of first use anywhere
and first use in commerce are February 1990 for the goods and
November 1995 for the services.

Opposition No. 91152646

## Likelihood of Confusion

We turn now to consideration of the issue of likelihood of confusion.  Our determination of likelihood of confusion is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion.  In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).  See also, In re Majestic Distilling Company, Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).  In any likelihood of confusion analysis, however, two key considerations are the similarities of the marks and the similarities of the goods and/or services.  See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods [and services] and differences in the marks.").  See also, In re Dixie Restaurants Inc., 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997).  Based on the record before us in this case, we find that confusion is likely.

Turning first to a consideration of the parties' respective goods and services, in Board proceedings "the question of likelihood of confusion must be determined based on an analysis of the mark as applied to the goods and/or services recited in applicant's application vis-a-vis the goods and/or services recited in opposer's registration,

Opposition No. 91152646

rather than what the evidence shows the goods and/or
services to be." Canadian Imperial Bank v. Wells Fargo
Bank, 811 F.2d 490, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987).
That is, the issue of likelihood of confusion must be
determined in light of the goods or services as identified
in the opposed application and the pleaded registration(s)
and, in the absence of any specific limitations therein, on
the basis of all normal and usual channels of trade and
methods of distribution for such goods or services. See
Octocom Systems Inc. v. Houston Computers Services Inc., 918
F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990); and CBS Inc. v.
Morrow, 708 F.2d 1579, 218 USPQ 198 (Fed. Cir. 1983).

Applicant identified its services as "music composition
for others." Clearly, this identification is not restricted
as to the nature of the music composition, the purchasers,
the channels of trade, or in any other way. Opposer BMG's
registration identifies the services as "providing music for
use in production of television shows, television
advertisements, motion pictures, video recordings, in-house
productions, and multi media applications; music publishing
services; providing information about and performances of
musical artists by means of a global computer information
network." While there is some language regarding the nature
of the services, this identification is not limited as to
purchasers, and/or channels of trade. In fact, it

15

Opposition No. 91152646

encompasses consumers ranging from large corporations to an
individual making a movie who seeks production music
therefor.

Applicant argues that its services of musical
composition are web-based, sold royalty-free on a per-
project basis (without usage restrictions), and allowing the
customer to rearrange and remix the musical product; whereas
with opposers' services the music product purchased is
generally packed and shipped in CD form, priced according to
type of usage, and customers are prevented from modifying
the music. Applicant concludes "there are clear
distinctions in [the parties'] products and services,
including structure, composition, and delivery." (Brief, p.
12.)

However, in this Board proceeding involving only the
question of registrability, applicant has applied for "music
composition for others." Thus, applicant's arguments
relating to these differences are not relevant. In any
event, we note that the argument is unpersuasive because
opposers offer their various music services (production,
publishing, etc.) primarily via CD, but they also offer
their services on the Internet, and applicant offers its
music composition services primarily via the Internet, but
it also offers its services via CD -- even if only rarely.

Opposition No. 91152646

We find that the parties' respective identified services are similar in nature.  Further, we find that applicant's identified services are closely related to the opposers' identified goods in the registrations, specifically, "prerecorded audio and video tapes" and "musical sound recordings."

Inasmuch as there are no limitations on trade channels or purchasers in the identifications of services in applicant's application or the goods and services in opposer BMG's registrations, the parties' respective goods and services must be considered to move in the same channels of trade, and would be offered to similar classes of purchasers.  See Octocom Systems v. Houston Computer Services, supra; and The Chicago Corp. v. North American Chicago Corp., 20 USPQ2d 1715 (TTAB 1991).  We find that the parties' goods and services move in the same or at least overlapping channels of trade to the same or at least overlapping classes of customers.

Applicant argues that applicant's and opposers' involved services are offered to sophisticated customers who purchase not on impulse but with care and through an extended sales cycle, involving extensive interaction and discussions with the customers, and primarily for commercial use.  (Applicant's brief, pp. 14-15.)

17

Opposition No. 91152646

Purchasers, either corporate/commercial or individual, of applicant's music composition services and of opposers' production music services may make such purchasing decisions with at least some degree of care. However, even if purchased with care, and through in-person discussions by sophisticated purchasers, these purchasers are not immune from confusion as to the source of services, particularly when they are sold under similar marks. See Wincharger Corporation v. Rinco, Inc., 297 F.2d 261, 132 USPQ 289 (CCPA 1962); and In re Decombe, 9 USPQ2d 1812 (TTAB 1988).

Moreover, there is no limitation in either applicant's identification of services or in those of opposers' registrations as to purchases being made by a particular class of purchasers and/or that the services are intended primarily for commercial use. Thus, there could be a mix of potential customers for both applicant's and opposers' services, including sophisticated consumers in the television and movie industries and on the Internet and individuals who choose to obtain music or sounds for their personal use, such as home movies or websites. That is, one segment of potential purchasers of these services is the general public. Where both professionals and members of the general public are relevant consumers, the standard is equal to that of the least sophisticated consumer. See e.g., In

18

Opposition No. 91152646

re Linkvest S.A., 24 USPQ2d 1716 (TTAB 1992); and In re

Artic Electronics Co., Ltd., 220 USPQ 836 (TTAB 1983).

We turn next to consideration of the similarities or

dissimilarities of the marks, and our initial determination

relates to opposers' assertion of a "family" of KILLER

marks. (See, e.g., opposers' brief, p. 5).[8] The "family"

of marks doctrine has applicability in those situations

where, prior to a defendant's first use of its challenged

mark containing a particular feature, the plaintiff had

established a family of marks characterized by that feature,

so that the defendant's subsequent use of its mark

containing the feature for goods or services which are

similar or related to plaintiff's will cause the relevant

purchasing public to assume that defendant's mark is yet

another member of plaintiff's family.  See Blansett

Pharmacal Co. Inc. v. Carmrick Laboratories Inc., 25 USPQ2d

1473, 1477 (TTAB 1992); and Econo-Travel Motor Hotel Corp.

v. Econ-O-Tel of America, Inc., 199 USPQ 307, 311-312 (TTAB

1978).

---

[8] Opposers did not plead a "family" of KILLER marks, mentioning
only the two individual KILLER MUSIC and design and KILLER TRACKS
marks, and referring throughout the pleading only to those two
marks as opposers' "KILLER Marks."  Applicant made no objection
on the basis that the issue was not pleaded.  It is clear from
the record that opposers' asserted "family" of KILLER marks was
tried by the parties.  Accordingly, opposers' notice of
opposition is hereby deemed amended to conform to the evidence in
accordance with Fed. R. Civ. P. 15(b) to include a claim of a
"family" of several KILLER marks.

Opposition No. 91152646

It is well settled that merely adopting, using and
registering a group of marks having a feature in common for
similar or related goods or services is insufficient to
establish, as against a defendant, a claim of ownership of a
family of marks characterized by the feature.  Rather, it
must be demonstrated that prior to defendant's first use of
its challenged mark, the various marks said to constitute
the plaintiff's family, or at least a good number of them,
were used and promoted together in such a manner as to
create among purchasers an association of common ownership
based upon the family characteristic.  See J & J Snack Foods
Corp. v. McDonald's Corp., 932 F.2d 1460, 18 USPQ2d 1889
(Fed. Cir. 1991); Witco Chemical Co. v. Whitfield Chemical
Co., 418 F.2d 403, 164 USPQ 43 (CCPA 1969); Hester
Industries Inc. v. Tyson Foods Inc., 2 USPQ2d 1646 (TTAB
1987); and Dan River, Inc. v. Apparel Unlimited, Inc., 226
USPQ 186 (TTAB 1985).

The problem with opposers' claim of a "family" of
KILLER marks is that there is insufficient evidence showing
use of these marks together as a "family" of marks prior to
applicant's use of its KILLER SOUND and design mark in April
1999.  The record shows that opposers have used the marks
KILLER MUSIC since 1990, KILLER TRACKS since 1989, and
KILLER LATINO since 1997.  However, the dates of first use
of several of opposers' other asserted "KILLER" marks are

20

Opposition No. 91152646

subsequent to applicant's proven first use of its mark.
For example, KILLER EDGE was first used in 1999, KILLER
PROMOS in 2000, KILLER ANIMATION in 2000, KILLER SCORES
around 2001, KILLER FX in 2001 or early 2002 and KILLER
SONIFER in 2002. (Gross dep., pp. 25, and 67-69.) While
there is some evidence of opposers' use of two or more
"KILLER" marks together, it is insufficient to establish a
"family" of KILLER marks recognized by the purchasing public
as all indicating source in opposers. In addition, as
explained above, much of opposers' evidence of use of a
"family" of KILLER marks involves use subsequent to
applicant's first use of its mark. Thus, we find that
opposers have not established a "family" of KILLER marks.

Although opposers have otherwise relied on two
registered marks, in considering the
similarities/dissimilarities between applicant's mark KILLER
SOUND and design and opposers' KILLER MUSIC (and design) and
KILLER TRACKS (in typed form) marks, we will focus on
opposers' KILLER TRACKS mark.

Our primary reviewing Court has held that in
articulating reasons for reaching a conclusion on the
question of likelihood of confusion, there is nothing
improper in stating that, for rational reasons, more or less
weight has been given to a particular feature or portion of
a mark. That is, one feature of a mark may have more

Opposition No. 91152646

significance than another.  See Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); Sweats Fashions Inc. v. Pannill Knitting Co., 833 F.2d 1560, 4 USPQ2d 1793, 1798 (Fed. Cir. 1987); and In re National Data Corporation, 753 F.2d 1056, 224 USPQ 749, 752 (Fed. Cir. 1985).

In this case, the word portion of applicant's mark is KILLER SOUND, and opposers' mark is KILLER TRACKS.  Thus, these marks share the dominant term KILLER.  Importantly, both applicant's mark and opposers' mark begin with the same first word, and it is often the first word that is most memorable to consumers.  See Presto Products, Inc. v. Nice-Pak Products, Inc., 9 USPQ2d 1895 (TTAB 1981).

We acknowledge that the term "killer" may have a very broad, general suggestive connotation in that it has a dictionary meaning.  Specifically, we take judicial notice of the following dictionary definitions of "killer":[9]

> (i)    "adjective: … 2. Slang  Having impressive or effective power or impact; formidable: had a killer smile; made killer profits"  The American Heritage Dictionary (Fourth Edition 2000); and

> (ii)   "adjective. 1. strikingly impressive or effective <a killer smile> <a killer resumé>"

---

[9] See The University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc., 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).  See also, TBMP §704.12 (2d ed. rev. 2004).

Opposition No. 91152646

<u>Merriam-Webster's Online
Dictionary</u>.

This general connotation would be applicable to both applicant's and opposer BMG's marks. Thus, applicant's mark connotes that its services (music composition) will result in the customer obtaining very impressive or "killer" sound. Likewise, with regard to opposers' mark, it connotes very

Opposition No. 91152646

impressive or "killer" soundtracks.  The second word in the
respective marks, "sound" and "tracks" have a similar
meaning in the context of the involved goods and services.
That is, the underscore of sound or music for a film, a
television show or a website, is generally known as a
"soundtrack."  We take judicial notice of the following
definition of the term "track" from <u>The Random House
Dictionary</u> (1987):  "…**14.** *Recording*. **a.** a band of recorded
sound laid along the length of a magnetic tape. … **d.** a
discrete, separate recording that is combined with other
parts of a musical recording to produce the final aural
version: *a special rhythm track added to the basic track*. …
**18**. soundtrack."  Applicant's argument regarding the many
meanings of the terms "sound" and "track" are not persuasive
because we must consider the connotations of words and
perceptions thereof by purchasers in the context of the
involved goods and services.  These marks, KILLER SOUND and
KILLER TRACKS, connote very similar meanings.

Clearly, we recognize that applicant's mark includes a
black and white circular or spiral design around the words
"killer·sound," while opposers' KILLER TRACKS mark is in
typed form only.  The design feature of applicant's mark is
not sufficient to obviate a finding of likelihood of
confusion.  The proper test in determining likelihood of
confusion is not on a side-by-side comparison of the marks,

but rather must be on the recollection of the average
purchaser, who normally retains a general rather than
specific impression of the many trademarks encountered; that
is, a purchaser's fallibility of memory over a period of
time must also be kept in mind.  See Grandpa Pidgeon's of
Missouri, Inc. v. Borgsmiller, 477 F.2d 586, 177 USPQ 573
(CCPA 1973); and Spoons Restaurants Inc. v. Morrision, Inc.,
23 USPQ2d 1735 (TTAB 1991), aff'd unpub'd (Fed. Cir., June
5, 1992).  Importantly, when spoken, the design feature of
applicant's mark is not necessarily seen by the purchasers.
Even when seen by purchasers and potential purchasers, they
may mistakenly believe that applicant's mark is another
revised version of opposers' KILLER MUSIC and design and
KILLER TRACKS marks, with both parties' marks serving to
indicate origin in the same source.

     Although the parties' marks are certainly not
identical, when considered in their entireties, we find that
applicant's mark and opposers' registered KILLER TRACKS mark
are somewhat similar in appearance, and that they are
particularly similar in sound, connotation and commercial
impression.  See In re Azteca Restaurant Enterprises Inc.,
50 USPQ2d 1209 (TTAB 1999).  Their contemporaneous use, on
and in connection with the related goods and similar
services, would be likely to cause confusion as to the

source or sponsorship of such goods and services.  See
Cunningham v. Laser Golf Corp., supra.

Another du Pont factor we consider in this case is the
fame of opposers' mark KILLER TRACKS.  "Fame of an opposer's
mark or marks, if it exists, plays a 'dominant role in the
process of balancing the DuPont factors.'"  Bose Corp. v.
QSC Audio Products, Inc., 293 F.3d 1367, 63 USPQ2d 1303
(Fed. Cir. 2002), quoting Recot Inc. v. M.C. Becton, 214
F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000).  See also,
Kenner Parker Toys Inc. v. Rose Art Industries Inc., 963
F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992).

Opposers have used this mark for over ten years.  They
have experienced "steady growth" (Gross dep., p 34),
generating over $52.5 million in sales for the goods and
services sold under the KILLER TRACKS mark in the last ten
years.  Advertising for these goods and services under the
KILLER TRACKS mark amounted to over $300,000 - $350,000 per
year during that time frame.  The record shows that opposers
have received extensive media coverage, including stories
about opposers and their mark KILLER TRACKS, reviews which
include the music credit to KILLER TRACKS, etc.  This
coverage includes extensive coverage in the media production
trade and industries, which are one type of relevant
consumers of the goods and services involved herein, as well

Opposition No. 91152646

as in general consumer media.   (Opposers' Notice of Reliance under Trademark Rule 2.122(e), exhibit A.)

Based on this record, we conclude that opposers have demonstrated the mark KILLER TRACKS is famous, and is thus entitled to a broad scope of protection.   See Bose Corporation v. QSC Audio Products, Inc., 293, F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002).[10]

The fame of opposer BMG's KILLER TRACKS mark plays a dominant role in the du Pont factor analysis.   Indeed, the fame of this mark increases the likelihood that consumers will believe that applicant's services emanate from or are sponsored by or are associated with opposers.

Applicant argues, under its heading "The Number Of Similar Marks In Use With Similar Goods," that the existence of third-party registrations which include the word "KILLER" in the mark and which are for similar or related goods and services supports a finding of lack of confusion.   (Brief, pp. 15-16.)   In support thereof, applicant submitted its notice of reliance under Trademark Rule 2.122(e) on five third-party registrations and one third-party application.

---

[10] Applicant argued that there is no direct evidence of consumer recognition and commented that opposer "failed to submit customer testimony or a single consumer survey to demonstrate the purported strength of their marks." (Brief, p. 9.)  This argument is unpersuasive as neither customer testimony nor consumer surveys are necessary to establish fame or the strength of the mark.  See Bose v. QSC, supra; and Hilson Research v. Society for Human Resource Management, 27 USPQ2d 1423, 1435-1436 (TTAB 1993).

Opposition No. 91152646

The third-party application carries no weight as it is
evidence only that the application was filed on a particular
date. The five third-party registrations submitted by
applicant are likewise totally devoid of evidentiary value
with regard to this du Pont factor because third-party
registrations do not establish that the marks shown therein
are in use, or that the public is familiar with them. See
Olde Tyme Foods Inc. v. Roundy's Inc., 961 F.2d 200, 22
USPQ2d 1542, 1545 (Fed. Cir. 1992); and Helene Curtis
Industries Inc. v. Suave Shoe Corp., 13 USPQ2d 1618 (TTAB
1989). There is no evidence before us of any use by any
third-party of any mark including the word "KILLER" for the
same or related goods or services.

Regarding the du Pont factor of "the nature and extent
of any actual confusion," the only evidence thereon is from
applicant, whose witness testified about one instance of
actual confusion and three inquiries regarding whether there
was an affiliation between applicant and opposers. (Gelat
dep., pp. 101-106.) Opposers' witness testified that he was
not directly aware of any instance of actual confusion.
(Gross dep., pp. 93-94.)

Applicant argues in its brief that there is an absence
of any "credible instance of actual confusion"; and that the
few instances about which applicant's witness testified are
de minimis, particularly in light of applicant's 20,000 hits

28

Opposition No. 91152646

per month on its website and its 75-100 telephone and e-mail inquiries each month.

We agree with applicant that there is not evidence of significant numbers of customers or potential customers actually confused regarding the involved marks for the involved goods and services.  However, in light of the co-existence of the parties' respective marks for only about five years, we find that this factor is neutral.  Moreover, the test is not actual confusion, but likelihood of confusion.  See Gillette Canada Inc. v. Ranir Corp., 23 USPQ2d 1768, 1774 (TTAB 1992).  Even if this factor were found to favor applicant, it is outweighed by the other du Pont factors in this case which favor opposers.[11]

On balance, and considering all of the evidence on the relevant du Pont factors, and giving each such factor its appropriate weight in the circumstances of this case, we find that there is a likelihood that the purchasing public would be confused when applicant uses KILLER SOUND and design as a mark for its services.

While we have no doubt in this case, if there were any doubt on the question of likelihood of confusion, it must be resolved against applicant who is the newcomer, as the newcomer has the opportunity of avoiding confusion, and is obligated to do so.  See TBC Corp. v. Holsa Inc., 126 F.3d

**Opposition No. 91152646**

1470, 44 USPQ2d 1315 (Fed. Cir. 1997); and In re Hyper

Shoppes (Ohio) Inc., 837 F.2d 840, 6 USPQ2d 1025 (Fed. Cir.

1988).

    **Decision:**  The opposition is sustained.

---

[11] We specifically note that we do not find that the evidence establishes that potential confusion would be de minimis.

30