# EXHIBIT A

AO 440 (Rev. 10/93) Summons in a Civil Action - SDNY WEB 4/99

# JUDGE BUCHWALD United States District Court

SOUTHERN _____ DISTRICT OF _____ NEW YORK

UNIVERSAL MUSIC - MGB NA LLC.,

Plaintiff,

**SUMMONS IN A CIVIL CASE**

V.

CASE NUMBER:

KILLERSOUND, INC.,

# 07 CIV 8353

Defendant.

TO: (Name and address of defendant)

Killersound, Inc.
101 First Street, Suite 321
Los Altos, California 94022

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

David Donahue, Esq.
Nicholas Elsenman, Esq.
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nation Plaza
New York, NY 10017
(212) 813-5900

an answer to the complaint which is herewith served upon you, within _____ Twenty (20) _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

(BY) DEPUTY CLERK

DATE     SEP 2 5 2007

David Donahue (DD 5808)
Nicholas Eisenman (NE 0213)
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
(212) 813-5900 (phone)
(212) 813-5901 (fax)

# JUDGE BUCHWALD

# 07 CIV 8353

Counsel for Plaintiff Universal Music - MGB NA LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| UNIVERSAL MUSIC - MGB NA LLC, | |
| Plaintiff, | Case No. _____ |
| v. | **COMPLAINT** |
| KILLERSOUND, INC., | |
| Defendant. | |

## COMPLAINT

Plaintiff Universal Music - MGB NA LLC (f/k/a BMG Music Publishing NA LLC), by

its undersigned attorneys, Fross Zelnick Lehrman & Zissu, P.C., for its Complaint against

defendant Killersound, Inc., alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff owns and operates the well-known KILLER TRACKS production music

company and has used the KILLER TRACKS trademark in connection with musical sound

recordings, sound effects and production music services for many years. The KILLER TRACKS

mark is among the best-known marks to consumers in the field of production music; indeed, the

{F0042801.7 }

Trademark Trial and Appeal Board (the "T.T.A.B.") of the United States Patent & Trademark Office (the "U.S.P.T.O.") has held that the mark is "famous."

2.     Long after plaintiff obtained exclusive rights in its KILLER TRACKS mark, defendant adopted and began using the KILLERSOUND trademark and trade name in connection with goods and services that compete directly with those offered by plaintiff.

3.     When defendant sought to register KILLERSOUND (and design) with the U.S.P.T.O., plaintiff promptly took action to block the registration, and succeeded in stopping defendant's blatant efforts to encroach upon plaintiff's trademark rights in KILLER TRACKS. In its decision refusing to register defendant's mark, the T.T.A.B. found that "there is a likelihood that the purchasing public would be confused" by defendant's use of the KILLERSOUND mark in connection with its music-related services.

4.     Notwithstanding the T.T.A.B.'s unambiguous finding that defendant's use of KILLERSOUND was likely to confuse the purchasing public and despite plaintiff's demand that defendant cease and desist its infringing activities, defendant has *expanded* its use of the KILLERSOUND mark. Plaintiff, thus, brings this action to protect its goodwill and seeks a permanent injunction, an accounting of defendant's profits flowing from its use of the KILLERSOUND mark, damages, attorneys' fees, and such other relief as the Court deems just and proper.

## THE PARTIES

5.     Plaintiff Universal Music - MGB NA LLC (f/k/a BMG Music Publishing NA LLC) is a limited liability company organized and existing under the laws of California, with offices at 245 Fifth Avenue, 8th Floor, New York, New York 10016.

{F0042801.7 }

6.    Upon information and belief, defendant Killersound, Inc. ("Killersound") is a corporation organized and existing under the laws of California with an office and place of business at 101 First Street, Suite 321, Los Altos, California 94022.

## JURISDICTION AND VENUE

7.    The Court has original jurisdiction over the subject matter of this action pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121, and under Sections 1331 and 1338(a) and (b) of the Judicial Code, 28 U.S.C. §§ 1331, 1338(a) and (b). The Court has supplemental jurisdiction over plaintiff's state law claims under Section 1367(a) of the Judicial Code, 28 U.S.C. § 1367(a).

8.    Upon information and belief, defendant regularly does and solicits business within the State of New York; has engaged in conduct, including, but not limited to, the marketing, promotion, advertising and sale of production music services, musical sound recordings, and sound effects under the KILLERSOUND mark, in this judicial district, causing injury within this district and State; has derived substantial revenues from such conduct within this district and State; and has and should have reasonably expected such conduct to have consequences within this district and State, including, but not limited to, the harm suffered by plaintiff complained of herein.

9.    Venue in this judicial district is proper pursuant to Sections 1391(b) and (c) of the Judicial Code, 28 U.S.C. § 1391(b) and (c), in that a substantial part of the events giving rise to plaintiff's claims, including, but not limited to, defendant's marketing, promotion, advertising, sale and offering for sale production music services, musical sound recordings, and sound effects under the KILLERSOUND mark in violation of plaintiff's exclusive rights in the KILLER

{F0042801.7 }

TRACKS mark, occurred in this district, and in that defendant is subject to personal jurisdiction in New York State and is therefore deemed to reside in New York State.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**A.**     **Plaintiff's Well-Known KILLER TRACKS Mark**

10.     Plaintiff is recognized as a global leader in the field of production music. Its production music division, which has done business as "Killer Tracks" and offered music-related goods and services under the KILLER TRACKS mark since the late-1980s, composes, produces, and licenses original music and sound effects to others for use in connection with (among other things) television, radio, and internet programming, commercials, company training videos, websites and multi-media presentations.

11.     Plaintiff's production music and sound effects have appeared in popular television shows such as *Seinfeld, 20/20, Law & Order* and *The Oprah Winfrey Show*, films such as *The Good Shepherd, The Matrix, Independence Day* and *Shark Tale*, and in television commercials for companies and products such as McDonald's, Coca Cola and Campbell's Soup.

12.     Plaintiff's rights in KILLER-formative marks date back to the mid-1980s, when plaintiff's predecessor-in-interest, Killer Music, began using the KILLER MUSIC name and mark in connection with its production music business. Soon thereafter, in the late-1980s, plaintiff adopted the name KILLER TRACKS for its production music business and as a mark for its goods and services.

13.     Plaintiff's KILLER TRACKS mark appears on compact discs that it distributes to customers of its production music services, as well as on its advertising, marketing and

promotional materials. A printout from plaintiff's website illustrating its use of its KILLER

TRACKS mark in connection with such products and materials is attached as **Exhibit 1**.

14.    Plaintiff spends hundreds of thousands of dollars annually on advertising,

marketing and promoting its music-related goods and services under the KILLER TRACKS

mark and trade name, and has devoted and continues to devote significant resources to advertise

and market the KILLER TRACKS mark and name on or in connection with its goods and

services throughout the United States. It advertises in nationally distributed print media,

including *The Hollywood Reporter* and various trade publications, and through its own brochures

and mailers, which are distributed to consumers each year. Plaintiff also markets its services

through sponsorship of music-related events, such as the South by Southwest Music and Media

Conference and many others.

15.    Since at least as early as 1997, plaintiff has advertised and prominently displayed

its products and services on the www.killertracks.com website. Visitors to plaintiff's

www.killertracks.com website can purchase, download and listen to plaintiff's production music

and sound effects and learn more about plaintiff and its products and services offered under its

KILLER TRACKS mark.

16.    Additionally, since at least as early as 1997, plaintiff has advertised its 1-800-4-

KILLER telephone line to further reinforce consumers' association of "KILLER"-formative

marks with plaintiff.

17.    Moreover, over the years, plaintiff has expanded its family of KILLER-formative

marks by combining the word KILLER with various other words to represent its production

music libraries of different genres. Such marks include, without limitation, KILLER LATINO,

KILLER EDGE, KILLER FX, KILLER SONIFIER, KILLER ANIMATION, KILLER

{F0042801.7 }

-5-

PROMOS, KILLER STAGE & SCREEN, KILLER SCORES, KILLER TOOLS, and KILLER

UNDERGROUND. Plaintiff has promoted each of these marks together with its KILLER

TRACKS mark in connection with its musical sound recordings, music production services and

other related goods and services.

18.     As a result of plaintiff's extensive advertising and sale of goods and services

under the KILLER TRACKS mark and trade name, KILLER TRACKS, when used in

connection with production music services, musical sound recordings, sound effects, and other

related goods and services, has become exclusively associated with plaintiff. Consumers

recognize music-related goods and services bearing the KILLER TRACKS mark as coming from

plaintiff.

19.     In addition to its common law rights in the KILLER TRACKS mark, plaintiff also

owns United States Trademark Registration No. 2,878,147 for the mark KILLER TRACKS in

International Class 9 in connection with "musical sound recordings," and in International Class

41 for "providing music for use in production of television shows, television advertisement,

motion pictures, video recordings, in-house production, and multi media applications; music

publishing services; providing information about and performances of musical artists by means

of a global computer information network" (the "KILLER TRACKS Registration"). The

KILLER TRACKS Registration is valid, subsisting and in full force and effect and constitutes

prima facie evidence of plaintiff's exclusive right to use the KILLER TRACKS mark in

connection with the goods or services identified therein. A copy of the KILLER TRACKS

Registration, along with a printout from the PTO's website illustrating the chain of title, is

attached as **Exhibit 2.**

{F0042801.7 }

-6-

**B.      Defendant's Infringing Activity**

20.      Defendant has never been associated or affiliated with plaintiff in any way, nor has plaintiff ever authorized, licensed or consented to defendant's conduct complained of herein.

21.      Long after plaintiff obtained exclusive rights in its KILLER TRACKS mark, defendant adopted and began using the KILLERSOUND mark and "Killersound" trade name in connection with the very goods and services that plaintiff offers—production music services, musical sound recordings, and sound effects.

22.      In connection with such activities, defendant prepares and distributes advertising and other materials that prominently display the KILLERSOUND mark and is marketing, advertising and promoting its goods and services on the www.killersound.com website, which is accessible to consumers throughout the United States, including in New York State. A printout of the home page of defendant's www.killersound.com website, on which defendant's infringing KILLERSOUND mark is prominently displayed in connection with production music services, is attached as **Exhibit 3**.

23.      Upon information and belief, defendant is selling goods and services under the KILLERSOUND mark to the same customers to whom plaintiff markets and sells its goods and services under its KILLER TRACKS mark.

**C.      The T.T.A.B. Ruled in Plaintiff's Favor that Defendant's Use of
          KILLERSOUND Will Confuse Consumers**

24.      Despite plaintiff's prior rights in the KILLER TRACKS mark for production music services, musical sound recordings, sound effects, and related goods and services, defendant filed U.S. Trademark Application Serial No. 75/702,568 seeking to register KILLERSOUND (and design) for "music composition for others" in International Class 41.

{F0042801.7 }

-7-

Defendant filed the application based on its alleged "intent to use" the mark under Section 1(b) of the Lanham Act, 15 U.S.C. § 1051(b). Defendant, however, did not state a date of first use in commerce.

25.    To protect its exclusive rights in its KILLER TRACKS mark, plaintiff filed an opposition proceeding before the T.T.A.B. against defendant's registration of the KILLERSOUND mark on the ground that it so closely resembles plaintiff's KILLER TRACKS mark as to be likely to cause confusion and/or cause mistake, or deceive consumers as to the source, sponsorship or approval of defendant's services, and to cause consumers to believe that defendant's services are sponsored by, affiliated with, approved by or otherwise connected with plaintiff (the "T.T.A.B. Proceeding").

26.    The T.T.A.B. sustained plaintiff's opposition and rejected defendant's application to register KILLERSOUND. *Killer Music, Inc. v. Killersound, Inc.*, Opposition No. 91152646 (T.T.A.B. March 22, 2005) (Unpublished). A true and correct copy of the T.T.A.B.'s decision is attached as **Exhibit 4**.

27.    In sustaining plaintiff's opposition to defendant's application to register KILLERSOUND, the T.T.A.B. held, *inter alia*, that (i) plaintiff's first use of the KILLER TRACKS mark was "prior to the filing date of applicant's intent-to-use based application," **Ex. 4** at 13, (ii) plaintiff's "mark KILLER TRACKS is famous, and is thus entitled to a broad scope of protection," *id.* at 27, and (iii) "there is a likelihood that the purchasing public would be confused when applicant uses KILLERSOUND and design as a mark for its services," *id.* at 29.

**D.    Despite Its Loss in the T.T.A.B. Proceeding Defendant Has Willfully Refused to Stop Using the KILLERSOUND Mark**

28.    Instead of stopping its use of the KILLERSOUND mark in light of the T.T.A.B.'s

finding that consumers would be confused, defendant instead has expanded its use of the

KILLERSOUND mark.

29.    When plaintiff learned that defendant still was using the KILLERSOUND mark

notwithstanding the T.T.A.B.'s decision, its counsel sent defendant a cease and desist letter,

demanding that it stop using the KILLERSOUND mark.

30.    Defendant refused to stop its use of the KILLERSOUND mark and to this day is

blatantly offering goods and services under the KILLERSOUND mark that directly compete

with the goods and services plaintiff offers under its KILLER TRACKS mark.

31.    Given defendant's indisputable knowledge of plaintiff's KILLER TRACKS mark,

and its loss in the T.T.A.B. Proceeding, the only conclusion that can be drawn is that

Defendant's use of a mark that so closely resembles plaintiff's KILLER TRACKS mark is

consciously designed to confuse the relevant consuming public, and to unfairly siphon off

plaintiff's customers.

32.    Indeed, defendant's use of KILLERSOUND in connection with the very

production music services, musical sound recordings, sound effects, and related goods and

services that plaintiff offers (i) is intentionally fraudulent, malicious, willful and wanton, (ii)

unfairly and unlawfully wrests from plaintiff control over its reputation, and (iii) unjustly

enriches defendant.

33.    Defendant's unauthorized acts as described herein have caused and will continue

to cause irreparable damage to plaintiff's business and goodwill unless restrained by this Court.

{F0042801.7 }

34.    Plaintiff has no adequate remedy at law.

## FIRST CLAIM FOR RELIEF
## TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1))

35.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 34 above as if fully set forth herein.

36.    Defendant's KILLERSOUND mark, when used in connection with production music services, musical sound recordings, sound effects, and related goods and services, is such a close variation of plaintiff's federally registered KILLER TRACKS mark as to be considered identical or substantially similar.

37.    Defendant's unauthorized use of the KILLERSOUND mark is likely to cause confusion, cause mistake, or deceive consumers as to the source, sponsorship or approval of defendant's goods and services and, specifically, to cause consumers to believe that defendant's goods and services are sponsored by, affiliated with, approved by or otherwise connected with plaintiff.

38.    Defendant's acts constitute infringement of plaintiff's federally registered KILLER TRACKS mark in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

39.    Defendant's conduct has caused and is causing immediate and irreparable injury to plaintiff.

## SECOND CLAIM FOR RELIEF
## FEDERAL UNFAIR COMPETITION (15 U.S.C. § 1125(a))

40.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 39 above as if fully set forth herein.

{F0042801.7 }

41.    Defendant's use of the KILLERSOUND mark and its conduct complained of herein constitutes a false designation of origin and a false representation as to the origin of defendant's goods and services, is likely to cause confusion, mistake, or deception as to the source of defendant's services, and is likely to create the false impression that defendant's goods and services are authorized, sponsored, endorsed, licensed by, or affiliated with plaintiff.

42.    Defendant's actions constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

43.    Defendant's conduct has caused and is causing immediate and irreparable injury to plaintiff.

### THIRD CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER NEW YORK COMMON LAW

44.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 43 above as if fully set forth herein.

45.    Defendant's conduct complained of herein is likely to confuse the public as to the origin, source or sponsorship of defendant's services, or to cause mistake or to deceive the public into believing that defendant's services are authorized, sponsored, endorsed, licensed by, or affiliated with plaintiff, in violation of plaintiff's rights in the KILLER TRACKS mark under New York State common law.

46.    Upon information and belief, defendant chose to use the KILLER TRACKS mark with constructive and/or actual knowledge of plaintiff's prior use of and rights in the KILLER TRACKS mark in connection with production music services, musical sound recordings, sound effects, and related goods and services.  By adopting and using a colorable imitation of the

valuable and distinctive KILLER TRACKS mark, defendant has been unjustly enriched and plaintiff has been damaged.

FOURTH CLAIM FOR RELIEF
VIOLATION OF THE NEW YORK DECEPTIVE
AND UNFAIR TRADE PRACTICES ACT
(N.Y. General Business Law § 349)

47.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 46 above as if fully set forth herein.

48.    Defendant's use of the KILLERSOUND mark has the capacity to deceive and is deceiving the public as to the source of sponsorship of defendant's goods and services. As a result, the public will be damaged.

49.    Defendant's conduct is willful and in knowing disregard of plaintiff's rights.

50.    Defendant has been and is engaged in deceptive acts or practices in the conduct of a business, trade or commerce in violation of Section 349 of the New York General Business Law.

51.    Defendant's conduct has caused and is causing immediate and irreparable injury to plaintiff.

FIFTH CLAIM FOR RELIEF
TRADEMARK DILUTION UNDER
NEW YORK LAW (N.Y. General Business Law § 360-l)

52.    Plaintiff repeats and realleges paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53.    Plaintiff's KILLER TRACKS mark is distinctive and acquired distinctiveness prior to defendant's first use of the KILLERSOUND Mark.

{F0042801.7 }

-12-

54.    Defendant's unauthorized use of the KILLERSOUND mark is diluting and is likely to continue diluting plaintiff's KILLER TRACKS mark by blurring the distinctiveness thereof, and is likely to injure and has injured plaintiff's business reputation, all in violation of Section 360-*l* of the General Business Law of the State of New York.

55.    Defendant's unauthorized acts as described herein have caused and will continue to cause irreparable damage to plaintiff.

WHEREFORE, plaintiff Universal Music - MGB NA LLC respectfully demands judgment as follows:

(1) That a permanent injunction be issued enjoining defendant, its officers, agents, directors, shareholders, principals, licensees, distributors, attorneys, servants, employees, affiliates, subsidiaries and assigns, and all those persons in concert or participation with any of them from:

      (a)    using the KILLERSOUND mark in connection with the advertising, promotion, manufacture, production, importation, distribution, displaying, sale or offering for sale of musical sound recordings and sound effects, or in connection with the advertising, promotion, sale or offering for sale of production music, music publishing, and music information services;

      (b)    using the KILLER TRACKS mark, or any mark that includes KILLER in whole or in part, or a phonetic equivalent or misspelling thereof, or any other simulation, reproduction, copy, colorable imitation or confusingly similar variation of the KILLER TRACKS mark, in connection with the advertising, promotion, manufacture, production, importation, distribution, displaying, sale or offering for

{F0042801.7 }

sale of musical sound recordings and sound effects, or in connection with the advertising, promotion, sale or offering for sale of production music, music publishing, and music information services;

(c)     conducting any activities in the United States that relate to, refer to or concern the advertising, promotion, manufacture, production, importation, distribution, displaying, sale or offering for sale of musical sound recordings and sound effects, or in connection with the advertising, promotion, sale or offering for sale of production music, music publishing, and music information services, under the KILLERSOUND mark or any mark that includes KILLER in whole or in part, or is a phonetic equivalent or misspelling thereof, or that is a simulation, reproduction, copy, colorable imitation or confusingly similar variation of the KILLER TRACKS mark;

(d)     using any false designation of origin or false description (including, without limitation, any letters or symbols), or performing any act, which can, or is likely to, lead members of the trade or public to believe that any goods manufactured, imported, advertised, promoted, distributed, displayed, produced, sold or offered for sale by defendant, or any services advertised, promoted, sold or offered for sale by defendant, are in any manner associated or connected with plaintiff, or are authorized, licensed, sponsored or otherwise approved by plaintiff;

(e)     engaging in any other activity constituting unfair competition with plaintiff, or constituting an infringement of the KILLER TRACKS mark;

(f)     applying to register or registering in the United States Patent and

Trademark Office or in any state trademark registry any mark consisting in whole

or in part of the word KILLERSOUND or consisting in whole or in part of any

simulation, reproduction, copy or colorable imitation of the KILLER TRACKS

mark, for musical sound recordings, sound effects, production music services,

music publishing services, music information services or any goods or services

related to the foregoing;

(g)     diluting or tarnishing plaintiff's KILLER TRACKS mark;

(h)     incorporating under, doing business under or seeking to trade under any

business name that includes the term "KILLER" in the United States;

(i)     using any domain name or metatag that includes in whole or in part the term

"KILLER" or any formative thereof, including, without limitation, the domain name

killersound.com, in connection with a web site that advertises, promotes, markets,

displays, sells or offers for sale or otherwise refers to musical sound recordings,

sound effects, production music services, music publishing services, music

information services or any goods or services related to the foregoing;

(j)     owning, renting, purchasing or otherwise obtaining rights to any internet

search term that includes in whole or in part the term "KILLER" or any formative

thereof for purposes of directing internet traffic to any web site that advertises,

promotes, displays or otherwise refers to musical sound recordings, sound effects,

production music services, music publishing services, music information services

or any goods or services related to the foregoing;

(k)     assisting, aiding or abetting any other person or business entity in

engaging in or performing any of the activities referred to in subparagraphs (a)
through (j) above;

(2)    Directing defendant to deliver up to plaintiff's attorneys for destruction all goods,
labels, tags, signs, stationery, prints, packages, promotional and marketing materials,
advertisements and other materials (a) currently in its possession or under defendant's control, or
(b) recalled by defendant pursuant to any order of the Court or otherwise, incorporating,
featuring or bearing the KILLERSOUND mark or any other simulation, reproduction, copy or
colorable imitation of the KILLER TRACKS mark in connection with musical sound recordings,
sound effects, production music services, music publishing services, music information services
or any goods or services related to the foregoing;

(3)    Directing such other relief as the Court may deem appropriate to prevent the
public from deriving the erroneous impression that any product manufactured, imported,
advertised, promoted, distributed, displayed, produced, sold or offered for sale, or any service
advertised, promoted, sold or offered for sale by defendant is in any manner authorized by
plaintiff or related in any way to plaintiff;

(4)    Directing defendant to file with the Court and serve upon plaintiff's counsel
within thirty (30) days after entry of judgment a report in writing under oath, setting forth in
detail the manner and form in which it has complied with the above;

(5)    Awarding plaintiff such damages it has sustained or will sustain by reason of
defendant's acts of trademark infringement and unfair competition and that such sums be trebled
pursuant to 15 U.S.C. § 1117;

(6)    Awarding plaintiff all gains, profits, property and advantages derived by

{P0042801.7 }

defendant from defendant's unlawful conduct;

(7)   Awarding to plaintiff exemplary and punitive damages to deter any further willful infringement as the Court finds appropriate;

(8)   Awarding to plaintiff its costs and disbursements incurred in this action, including reasonable attorneys' fees pursuant to 15 U.S.C. §1117(a);

(9)   Awarding to plaintiff interest, including pre-judgment interest on the foregoing sums; and

(10)   Awarding to plaintiff such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         September 24, 2007

Respectfully submitted,

FROSS ZELNICK LEHRMAN &
ZISSU, P.C.

By: _____
    David Donahue (DD 5808)
    Nicholas Eisenman (NE 0213)

    866 United Nations Plaza
    New York, New York 10017
    (212) 813-5900

    Attorneys for Plaintiff

# EXHIBIT 1





4:50:52 PM 9/19/2007

# EXHIBIT 2

{F0107325.1 }

Int. Cls.: 9 and 41

Prior U.S. Cls.: 21, 23, 26, 36, 38, 100, 101 and 107

## United States Patent and Trademark Office

Reg. No. 2,878,147

Registered Aug. 31, 2004

### TRADEMARK
### SERVICE MARK
### PRINCIPAL REGISTER

## KILLER TRACKS

KILLER MUSIC, INC. (CALIFORNIA CORPORA-
TION)
30 KEWEN PLACE
SAN MARINO, CA 91108

FOR: MUSICAL SOUND RECORDINGS, IN
CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 2-0-1990; IN COMMERCE 2-0-1990.

FOR: PROVIDING MUSIC FOR USE IN PRODUC-
TION OF TELEVISION SHOWS, TELEVISION AD-
VERTISEMENTS, MOTION PICTURES, VIDEO
RECORDINGS, IN-HOUSE PRODUCTIONS, AND
MULTI MEDIA APPLICATIONS; MUSIC PUBLISH-
ING SERVICES; PROVIDING INFORMATION
ABOUT AND PERFORMANCES OF MUSICAL AR-

TISTS BY MEANS OF A GLOBAL COMPUTER
INFORMATION NETWORK, IN CLASS 41 (U.S.
CLS. 100, 101 AND 107).

FIRST USE 11-0-1995; IN COMMERCE 11-0-1995.

OWNER OF U.S. REG. NO. 1,466,219.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "TRACKS" , APART FROM THE
MARK AS SHOWN.

SER. NO. 76-053,099, FILED 5-22-2000.

BARBARA A. LOUGHRAN, EXAMINING ATTOR-
NEY

**United States Patent and Trademark Office**

Home|Site Index|Search|Guides|Contacts|eBusiness|eBiz alerts|News|Help



## Assignments on the Web > Trademark Query

# Trademark Assignment Abstract of Title

**Total Assignments: 3**

**Serial #:** 76053099          **Filing Dt:**                    **Reg #:** 2878147          **Reg. Dt:**
**Mark:**

## Assignment: 1

**Reel/Frame:** 2704/0991     **Received:** 08/22/2003     **Recorded:** 08/22/2003          **Pages:** 7
**Conveyance:** ASSIGNS THE ENTIRE INTEREST
**Assignor:** KILLER MUSIC, INC.                                      **Exec Dt:** 08/07/2003
                                                               **Entity Type:** CORPORATION
                                                               **Citizenship:** CALIFORNIA

**Assignee:** BMG SONGS, INC.                                  **Entity Type:** CORPORATION
            8750 WILSHIRE BOULEVARD                            **Citizenship:** CALIFORNIA
            BEVERLY HILLS, CALIFORNIA 90211
**Correspondent:** COWAN, LIEBOWITZ & LATMAN, P.C.
            MARY L. KEVLIN, ESQ.
            1133 AVENUE OF THE AMERICAS
            NEW YORK, NY 10036-6799

## Assignment: 2

**Reel/Frame:** 2965/0849     **Received:** 10/27/2004     **Recorded:** 10/27/2004          **Pages:** 3
**Conveyance:** CHANGE OF NAME
**Assignor:** BMG SONGS, INC.                                  **Exec Dt:** 07/30/2004
                                                               **Entity Type:** CORPORATION
                                                               **Citizenship:** CALIFORNIA

**Assignee:** BMG MUSIC PUBLISHING NA, INC.                    **Entity Type:** CORPORATION
            1540 BROADWAY                                      **Citizenship:** CALIFORNIA
            NEW YORK, NEW YORK 10036
**Correspondent:** FROSS ZELNICK LEHRMAN & ZISSU, P.C.
            LAWRENCE ELI APOLZON
            866 UNITED NATIONS PLAZA
            NEW YORK, NY 10017

## Assignment: 3

**Reel/Frame:** 3552/0121     **Received:** 05/31/2007     **Recorded:** 05/31/2007          **Pages:** 3
**Conveyance:** CORPORATE CONVERSION
**Assignor:** BMG MUSIC PUBLISHING NA, INC.                    **Exec Dt:** 12/14/2006
                                                               **Entity Type:** CORPORATION
                                                               **Citizenship:** CALIFORNIA

**Assignee:** BMG MUSIC PUBLISHING NA LLC                      **Entity Type:** LIMITED LIABILITY COMPANY
            245 FIFTH AVENUE                                   **Citizenship:** CALIFORNIA
            8TH FLOOR
            NEW YORK, NEW YORK 10001
**Correspondent:** LAWRENCE ELI APOLZON
            FROSS ZELNICK LEHRMAN & ZISSU, P.C.
            866 UNITED NATIONS PLAZA
            NEW YORK, NY 10017

Search Results as of: 09/19/2007 05:07 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.0.1

Web interface last modified: April 20, 2007 v.2.0.1

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

# EXHIBIT 3

**killersound**

- site navigation -

Home | Custom Services | Products    Log In | My Cart | Bookmarks    Help | Contact Us    Tech Center | Clients | Partners |
Overview

# killersound

*take a tour*

## music and sound design for new media

royalty-free    customizable    world-class    remixable

**Search for Music**

[          ] GO

type any word or ID#

**Advanced Search**

**Halloween Picks**

**Hot Picks - Save $$**

**Hot Shots**

**New Releases**

**Loops**
» Compilations
» Single

**Re-Mixable Library**
» Classical
» Electronica
» Jazz
» Kids
» Light Sounds
» Mood/Ambient
» Pop/Urban
» Rock
» Techno
» World

**SOUND FX**
» Single CD Sets
» Multi CD Sets
» Downloadable

**MULTIMEDIA**
» Bigshot Bundles

**Tips & Tutorials**

**Free Stuff**

**View Intro**

killersound licenses **royalty-free,** original music and sound for use in all media. Our audio is delivered in **components** (or **building blocks**) for the ultimate freedom, giving you the option to **remix the music** to fit the visuals in any project.
...*more*

killersound also **creates, produces** and **delivers** audio & visual content for **wireless devices** including **3GPP video** and **Flash Lite** content.
...*more*

**search**    **listen**    **license**    **download**

click the images
to use **SoundScan**
our music preview tool

 classical     electronica

 jazz     kids

 light     mood    pop/urban

 rock     techno



 world

## SoundSet demo...

E0153_4_140_6
SoundSet

| File Name | Size | Dur. |
|---|---|---|
| E0153bass | 614 KB | 2 sec |
| E0153drums | 307 KB | 1 sec |
| E0153electro | 307 KB | 1 sec |
| E0153synth | 614 KB | 2 sec |





## In the News...

**killersound is wireless!!!** Do you have a Sprint phone? Download animated ringtones with killersound audio... Titles include Dick Tracy, Ziggy, Garfield and many others.

**Flash is mobile!!!** killersound is using the latest technology from Adobe to develop FlashLite content for mobile devices. Contact us if you want to make your content go wireless!

Now you can **license** many of our **loops individually!** Choose from a variety of selections for $9.99 each.

Copyright 2000-2007 killersound, Inc. - K I L L T H E S I L E N C E ®
Contact Us | Privacy Policy | Terms of Use | License Agreement | FAQ | Become a Member

4:59:04 PM 9/19/2007

# EXHIBIT 4

> **THIS DISPOSITION IS NOT CITABLE AS PRECEDENT OF THE TTAB**

Mailed:  March 22, 2005

## UNITED STATES PATENT AND TRADEMARK OFFICE

---

### Trademark Trial and Appeal Board

---

Killer Music, Inc. and BMG Songs, Inc., dba Killer Tracks[1]
v.
killersound, Inc.

---

Opposition No. 91152646
to application Serial No. 75702568
filed on May 11, 1999

---

Mary L. Kevlin of Cowan, Liebowitz & Latman, P.C. for Killer Music, Inc. and BMG Songs, Inc.

Ian K. Boyd of Harvey Siskind Jacobs LLP for killersound, Inc.

---

Before Chapman, Bucher and Holtzman, Administrative Trademark Judges.

Opinion by Chapman, Administrative Trademark Judge:

Applicant, killersound, Inc. (a California corporation), filed an application to register on the Principal Register the mark shown below

---

[1] The notice of opposition includes two named opposers and opposers' cover letter refers to an enclosed check and a deposit account for any insufficient or additional fees.  The Board instituted the opposition with only "Killer Music, Inc." as the opposer.  That is hereby corrected and both opposers are listed in the caption of this proceeding.  (The additional fee for the

Opposition No. 91152646



for services identified as "music composition for others" in
International Class 41.  The application is based on
applicant's assertion of a bona fide intention to use the
mark in commerce.

The application has been opposed by Killer Music, Inc.
(a California corporation) (hereinafter "Killer Music") and
BMG Songs, Inc. (a California corporation) (hereinafter
"BMG") on the basis that for many years both opposers have
marketed "musical and video recordings, providing music for
television, films, videos and multi-media works, music
publishing and musical information services, under the marks
KILLER MUSIC and/or KILLER TRACKS" (paragraph 1); that
Killer Music owns (i) Registration No. 1466219 issued
November 24, 1987 for the mark shown below



("music" disclaimed) for "prerecorded audio and video tapes"
in International Class 9, and (ii) application Serial No.
76053099 filed May 22, 2000 for the mark KILLER TRACKS

---

second opposer has been charged to opposers' law firm's deposit
account.)

Opposition No. 91152646

("tracks" disclaimed) for "musical sound recordings" in
International Class 9 and "providing music for use in
production of television shows, television advertisements,
motion pictures, video recordings, in-house productions, and
multi media applications; music publishing services;
providing information about and performances of musical
artists by means of a global computer information network"
in International Class 41; that BMG is the exclusive
licensee of the KILLER TRACKS mark; that since long prior to
applicant's application filing date, opposers have
extensively advertised and promoted the sale of their goods
-- musical sound recordings, and their provision of services
-- production music services, music publishing services and
music information services under the "KILLER Marks"; that
opposers have built up highly valuable goodwill for their
"KILLER Marks"; and that applicant's mark, when used in
connection with its "music composition for others" services,
so resembles opposers' previously used and registered marks,
as to be likely to cause confusion, mistake, or deception.

In its answer applicant denies the salient allegations
of the notice of opposition and asserts the affirmative
defenses of laches, waiver, estoppel and acquiescence
(paragraphs 3-6).[2]

---

[2] In its brief (p. 3), applicant stated that the issue before the
Board is whether there is a likelihood of confusion when the
involved marks are used on or in connection with the involved

3

Opposition No. 91152646

The record consists of the pleadings; the file of
applicant's application; opposers' testimony, with exhibits,
of Gary Gross, president of opposer BMG; and opposers'
notices of reliance on the following items:  (1) a status
and title copy of opposers' pleaded Registration No.
1466219, and a certified copy of opposers' pleaded
application Serial No. 76053099, (2) applicant's amended
responses to opposers' first set of interrogatory Nos. 2, 6,
7, 11, 14 and 16 and the documents identified therein,[3] (3)
applicant's responses to opposers' requests for admission
Nos. 6-9 and the documents identified therein, and (4)
copies of numerous publications under Trademark Rule
2.122(e).  Applicant submitted the testimony, with exhibits,

---

goods and services.  Applicant made no reference in its brief to
any of its pleaded affirmative defenses, except on page 7,
applicant argued that opposers sent a cease and desist letter to
applicant on May 22, 2000; that applicant responded in a letter
dated June 1, 2000; and that, thereafter opposers did not contact
applicant for two years when they filed the opposition in July
2002.  (See Gelat dep., pp. 93-95, Exh. No. 17.)  To whatever
extent applicant intends thereby to assert its affirmative
defenses, we find that the evidence of record is insufficient to
establish any of applicant's pleaded affirmative defenses --
laches, waiver, estoppel and acquiescence.  With specific regard
to the defense of laches, see National Cable Television
Association, Inc. v. American Cinema Editors, Inc., 937 F.2d
1572, 19 USPQ2d 1424 (Fed. Cir. 1991).
   We note that applicant's "affirmative defenses" also include an
assertion that opposers' pleading fails to state a claim
(paragraph 1).  Applicant did not pursue this defense either
before trial by motion to dismiss or after trial in its brief.
Applicant has waived this defense.  (Moreover, the notice of
opposition states a claim.)  Applicant also pleads certain
"defenses" which relate more to a further denial of opposers'
assertion of a likelihood of confusion (paragraphs 2, 7 and 8).
These are not "affirmative defenses" and will not be treated as
such.

4

Opposition No. 91152646

of Frank Gelat, applicant's president and creative director;
and a notice of reliance under Trademark Rule 2.122(e) on
printouts from the USPTO's Trademark Electronic Search
System (TESS) of five third-party registrations and one
third-party application.

Both parties filed briefs on the case. Neither party
requested an oral hearing.

Gary Gross, BMG's president, explains that opposers are
in the business of producing and licensing music and other
audio components for customers. This is known as the
"production music" business. It involves analyzing the
market needs for various types of music/sounds used in
various types of productions (e.g., television programming
and advertising, films, commercials, company training
videos), and then producing the music or sounds needed and
licensing them to customers for their needs. In addition to
production music, opposers also engage in music publishing,
which means they own the copyrights for certain music and
act as publisher for those compositions.

Opposers organize the music into several libraries or
brands (e.g., KILLER TRACKS, KILLER CLASSICAL, KILLER
LATINO, KILLER PROMOS, KILLER FX, KILLER ANIMATION) and
within each of the libraries, there are sub categories by
genre (e.g., classical, rock, jazz, hip-hop, trip-hop).

---

[3] Applicant's answers to opposers' interrogatory Nos. 6 and 7

5

Case 1:07-cv-08353-NRB    Document 5-2    Filed 03/20/2008    Page 34 of 58
Case 1:07-cv-08353-NRB    Document 1    Filed 09/25/2007    Page 32 of 56
Opposition No. 91152646

Opposers distribute the music (or other sounds) to customers primarily via CD but also do so through the Internet. (Gross dep., p. 6.)

Customers can either order from opposers' preexisting catalog of music or opposers will create custom music for customers. Rearrangements of the music/sounds by the customers is not allowed without prior permission, but customers can remix the musical instruments in the compositions. (Gross dep., p. 89.) Opposers' customers include "almost every major film studio," "almost every major television broadcaster," "advertising agencies" and a wide range of companies from Fortune 500 corporations to "mom-and-pop companies." (Gross dep., pp. 10-11.)

Customers pay for opposers' goods and services based on the manner in which they use the music. For example, using the production music in a national television show costs one rate, while using it on a local radio program is another rate.

The mark, KILLER TRACKS, is not only the dba name of opposer BMG, it is the name of a major library of opposers' production music, and has been in use for opposers' production music since 1990. As of 2003, opposer BMG owns both the KILLER MUSIC and design and KILLER TRACKS marks, when BMG purchased the assets of opposer Killer Music, Inc.,

---

were filed under seal as confidential.

Opposition No. 91152646

including the trademarks, the musical compositions, the archives, etc.  (Gross dep., pp. 41-43.)

Opposers' sales of their goods and services offered under the KILLER TRACKS mark from 1997 - 2003 totaled about $52.5 million, with advertising/promotional expenses during that time of $300,000 - $350,000 annually.  Opposers' marks, KILLER TRACKS and KILLER MUSIC and design, used in connection with production music services, music entertainment services, music publishing services, music library services and music products, have been the subject of many articles in the relevant publicly circulated media since the late 1980s.

Opposers advertise in trade publications (e.g., "Post Magazine," "TV and Radio Reports," "Hollywood Reporter") and through direct mail, on the Internet, and by exhibiting at trade shows.  Opposers generally request or require that they be given a music title credit in the movies and television shows which utilize their goods or services.

Opposers are not aware of any instances of actual confusion.

Applicant, killersound, Inc., was founded in April 1999, following a positive response to the music composed by one of applicant's founders in connection with a colleague's website.  Applicant employs two people, Mr. Frank Gelat and Mr. Brett Yokum.  Applicant offers a variety of about 500

7

Opposition No. 91152646

"SoundSets" (i.e., actual compositions) which contain both a
pre-made short (about 10-15 seconds long) and a long
(generally 40-45 seconds) version; and the "SoundSet" can
also be the components or elements or instrument parts
whereby the customer can rearrange, remix or recompose the
music to fit whatever production they are doing.  (For
example, a customer might change the pitch or the tempo of
the various components or match another piece of music they
are doing in their production.)  Applicant also offers music
loops and sound loops (usually 3 to 20 seconds long), sound
effects and sound logos or signatures.  Applicant's online
music libraries are subdivided by genre (e.g., classical,
jazz, mood, pop, rock, techno).  Applicant also creates
custom-made products for customers.

Applicant's customers include advertising agencies,
corporations, multimedia artists, freelance designers and
video designers.

The customers may download samples of a composition for
a free trial.  When purchasing applicant's services, the
cost averages around $375 per license, except the average
cost for a custom composition is $1500 to $2000.[4]
Applicant markets and delivers its product through its

---

[4] These cost figures were filed during trial under seal as
confidential.  However, applicant included the numbers in its
brief (pp. 5 and 12), and its brief was not filed (in relevant
part) under seal as confidential.  Thus, applicant waived the
confidentiality of this information.

8

Opposition No. 91152646

website.  That is, once the customer goes through the

purchasing transaction, then the customer downloads the

product to their desktop.  Although applicant has on very

rare occasions (about four or five times) provided a

Case 1:07-cv-08353-NRB   Document 5-2   Filed 03/20/2008   Page 38 of 58
Case 1:07-cv-08353-NRB   Document 1   Filed 09/25/2007   Page 36 of 56
Opposition No. 91152646

customer with a CD. The general length of time between
customer inquiry and customer purchase is a week or week and
a half, except for custom orders which would be one to two
months, all with much contact with the client. Applicant
requires that the customer sign a license agreement, and pay
a one-time flat fee, without reporting usage to applicant.

Applicant offers some of its services (excluding its
SoundSets) through third-parties, specifically,
soundeffects.com, buycreative.com, bigshotmedia.com and
mediabakery.com. Also, applicant offers its services
bundled in third-party software programs (e.g., Macromedia
Flash software and Adobe Live Motion).

Applicant's gross revenues were also filed as
confidential and cannot be stated here. Suffice it to say,
its accumulated gross revenues for the years 2000 - 2003 do
not reach into the millions of dollars; and its advertising
expenses are a very small percentage of its revenues.

Mr. Frank Gelat created the word mark "killer sound"
inspired by the positive feedback from his first project of
music for a colleague's website. The logo portion of the
mark was created by his co-founder, Brett Yokum. Frank
Gelat did not know Mr. Yokum's inspiration for that design.

Applicant's website receives about 20,000 hits per
month. Applicant attends trade shows (e.g., FlashForward,
MacWorld), mails out brochure advertisements to customers

10

Opposition No. 91152646

and potential customers, and has appeared on third-party
websites (e.g., the "Hot News" section of Apple's website).

When Mr. Gelat was asked if applicant had experienced
any actual confusion, he testified that he knew of only one
instance which occurred in September or October 2003.[5]
Specifically, Mr. Gelat testified that an existing customer
of applicant who had licensed a product from applicant, e-
mailed a request to try several products, which applicant
determined were products from opposers' KILLER TRACKS site.
He also testified that he knew of three instances when
consumers called applicant inquiring whether applicant was
related to or affiliated with opposers. All occurred in the
same time frame, September/October 2003. One call was from
a distributor of music libraries wondering if applicant was
affiliated with KILLER TRACKS and wanting to do business
with applicant; the other two callers wanted general
information about the products and services. None of
applicant's business partners or resellers have ever
reported any instance of actual confusion to applicant.

### Priority

Opposers made of record a status and title copy of
pleaded Registration No. 1466219 for the mark KILLER MUSIC

---

[5] According to applicant's answer to opposers' interrogatory No.
11, the incident occurred in October 2003.

11

Case 1:07-cv-08353-NRB    Document 5-2    Filed 03/20/2008    Page 40 of 58
Case 1:07-cv-08353-NRB    Document 1    Filed 09/25/2007    Page 38 of 56
Opposition No. 91152646

and design for "prerecorded audio and video tapes."[6]  With

regard to the second pleaded mark KILLER TRACKS, after

trial, but before the briefing of this case, the pleaded

application Serial No. 76053099 issued on August 31, 2004 as

Registration No. 2878147.  Opposers specifically referred to

this second registration in their brief on the case (e.g.,

brief, pp. 3 and 4).  Applicant acknowledged that opposers'

pleaded application had registered, referring to it as the

"then-pending application for KILLER TRACKS mark" (brief, p.

2).  Further, applicant made no objection to opposers'

reference to the subsequent registration of the pleaded

application for the mark KILLER TRACKS.  Moreover, there is

clear testimony that BMG purchased the KILLER MUSIC and

design mark and the KILLER TRACKS mark in 2003, thus making

title to the second (recently issued) registration clear.

(Gross, dep., p. 41.)

    Based on the above, we conclude that opposers'

Registration No. 2878147 (issuing from pleaded application

Serial No. 76053099) for "musical sound recordings" and

"providing music for use in production of television shows,

television advertisements, motion pictures, video

recordings, in-house productions, and multi media

applications; music publishing services; providing

---

[6] Registration No. 1466219 issued November 24, 1987; Section 8
affidavit accepted.  The word "music" is disclaimed.  The claimed

Opposition No. 91152646

information about and performances of musical artists by
means of a global computer information network"[7] is properly
of record.

In view of opposer BMG's ownership of valid and
subsisting registrations for its KILLER MUSIC and design and
KILLER TRACKS marks, the issue of priority does not arise in
this opposition proceeding.  See King Candy Co. v. Eunice
King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108, 110 (CCPA
1974); Massey Junior College, Inc. v. Fashion Institute of
Technology, 492 F.2d 1399, 181 USPQ 272, at footnote 6 (CCPA
1972); and Carl Karcher Enterprises, Inc. v. Stars
Restaurants Corp., 35 USPQ2d 1125, 1128 (TTAB 1995).
Moreover, opposers' have established use of the marks KILLER
MUSIC and design and KILLER TRACKS prior to the filing date
of applicant's intent-to-use based application, May 11,
1999.  The record shows that applicant commenced use of its
mark for "custom audio services" in April 1999.  (See, e.g.,
applicant's answer to opposers' interrogatory No. 2.)
Opposers' proven first use of their two pleaded marks is
prior to applicant's proven first use date.

---

dates of first use anywhere and first use in commerce are March
1984 and June 1984, respectively.
[7] Registration No. 2878147 issued August 31, 2004.  The word
"tracks" is disclaimed.  The claimed dates of first use anywhere
and first use in commerce are February 1990 for the goods and
November 1995 for the services.

13

Case 1:07-cv-08353-NRB    Document 5-2    Filed 03/20/2008    Page 42 of 58
Case 1:07-cv-08353-NRB    Document 1    Filed 09/25/2007    Page 40 of 56

Opposition No. 91152646

## Likelihood of Confusion

We turn now to consideration of the issue of likelihood
of confusion.  Our determination of likelihood of confusion
is based on an analysis of all of the facts in evidence that
are relevant to the factors bearing on the issue of
likelihood of confusion.  In re E. I. du Pont de Nemours &
Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).  See also, In
re Majestic Distilling Company, Inc., 315 F.3d 1311, 65
USPQ2d 1201 (Fed. Cir. 2003).  In any likelihood of
confusion analysis, however, two key considerations are the
similarities of the marks and the similarities of the goods
and/or services.  See Federated Foods, Inc. v. Fort Howard
Paper Co., 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The
fundamental inquiry mandated by §2(d) goes to the cumulative
effect of differences in the essential characteristics of
the goods [and services] and differences in the marks.").
See also, In re Dixie Restaurants Inc., 105 F.3d 1405, 41
USPQ2d 1531 (Fed. Cir. 1997).  Based on the record before us
in this case, we find that confusion is likely.

Turning first to a consideration of the parties'
respective goods and services, in Board proceedings "the
question of likelihood of confusion must be determined based
on an analysis of the mark as applied to the goods and/or
services recited in applicant's application vis-a-vis the
goods and/or services recited in opposer's registration,

14

Opposition No. 91152646

rather than what the evidence shows the goods and/or

services to be."  Canadian Imperial Bank v. Wells Fargo

Bank, 811 F.2d 490, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987).

That is, the issue of likelihood of confusion must be

determined in light of the goods or services as identified

in the opposed application and the pleaded registration(s)

and, in the absence of any specific limitations therein, on

the basis of all normal and usual channels of trade and

methods of distribution for such goods or services.  See

Octocom Systems Inc. v. Houston Computers Services Inc., 918

F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990); and CBS Inc. v.

Morrow, 708 F.2d 1579, 218 USPQ 198 (Fed. Cir. 1983).

Applicant identified its services as "music composition

for others."  Clearly, this identification is not restricted

as to the nature of the music composition, the purchasers,

the channels of trade, or in any other way.  Opposer BMG's

registration identifies the services as "providing music for

use in production of television shows, television

advertisements, motion pictures, video recordings, in-house

productions, and multi media applications; music publishing

services; providing information about and performances of

musical artists by means of a global computer information

network."  While there is some language regarding the nature

of the services, this identification is not limited as to

purchasers, and/or channels of trade.  In fact, it

15

Opposition No. 91152646

encompasses consumers ranging from large corporations to an
individual making a movie who seeks production music
therefor.

Applicant argues that its services of musical
composition are web-based, sold royalty-free on a per-
project basis (without usage restrictions), and allowing the
customer to rearrange and remix the musical product; whereas
with opposers' services the music product purchased is
generally packed and shipped in CD form, priced according to
type of usage, and customers are prevented from modifying
the music. Applicant concludes "there are clear
distinctions in [the parties'] products and services,
including structure, composition, and delivery." (Brief, p.
12.)

However, in this Board proceeding involving only the
question of registrability, applicant has applied for "music
composition for others." Thus, applicant's arguments
relating to these differences are not relevant. In any
event, we note that the argument is unpersuasive because
opposers offer their various music services (production,
publishing, etc.) primarily via CD, but they also offer
their services on the Internet, and applicant offers its
music composition services primarily via the Internet, but
it also offers its services via CD -- even if only rarely.

16

Opposition No. 91152646

    We find that the parties' respective identified
services are similar in nature.  Further, we find that
applicant's identified services are closely related to the
opposers' identified goods in the registrations,
specifically, "prerecorded audio and video tapes" and
"musical sound recordings."

    Inasmuch as there are no limitations on trade channels
or purchasers in the identifications of services in
applicant's application or the goods and services in opposer
BMG's registrations, the parties' respective goods and
services must be considered to move in the same channels of
trade, and would be offered to similar classes of
purchasers.  See Octocom Systems v. Houston Computer
Services, supra; and The Chicago Corp. v. North American
Chicago Corp., 20 USPQ2d 1715 (TTAB 1991).  We find that the
parties' goods and services move in the same or at least
overlapping channels of trade to the same or at least
overlapping classes of customers.

    Applicant argues that applicant's and opposers'
involved services are offered to sophisticated customers who
purchase not on impulse but with care and through an
extended sales cycle, involving extensive interaction and
discussions with the customers, and primarily for commercial
use.  (Applicant's brief, pp. 14-15.)

17

Opposition No. 91152646

Purchasers, either corporate/commercial or individual, of applicant's music composition services and of opposers' production music services may make such purchasing decisions with at least some degree of care. However, even if purchased with care, and through in-person discussions by sophisticated purchasers, these purchasers are not immune from confusion as to the source of services, particularly when they are sold under similar marks. See Wincharger Corporation v. Rinco, Inc., 297 F.2d 261, 132 USPQ 289 (CCPA 1962); and In re Decombe, 9 USPQ2d 1812 (TTAB 1988).

Moreover, there is no limitation in either applicant's identification of services or in those of opposers' registrations as to purchases being made by a particular class of purchasers and/or that the services are intended primarily for commercial use. Thus, there could be a mix of potential customers for both applicant's and opposers' services, including sophisticated consumers in the television and movie industries and on the Internet and individuals who choose to obtain music or sounds for their personal use, such as home movies or websites. That is, one segment of potential purchasers of these services is the general public. Where both professionals and members of the general public are relevant consumers, the standard is equal to that of the least sophisticated consumer. See e.g., In

18

Opposition No. 91152646

re Linkvest S.A., 24 USPQ2d 1716 (TTAB 1992); and In re

Artic Electronics Co., Ltd., 220 USPQ 836 (TTAB 1983).

We turn next to consideration of the similarities or

dissimilarities of the marks, and our initial determination

relates to opposers' assertion of a "family" of KILLER

marks. (See, e.g., opposers' brief, p. 5).[8] The "family"

of marks doctrine has applicability in those situations

where, prior to a defendant's first use of its challenged

mark containing a particular feature, the plaintiff had

established a family of marks characterized by that feature,

so that the defendant's subsequent use of its mark

containing the feature for goods or services which are

similar or related to plaintiff's will cause the relevant

purchasing public to assume that defendant's mark is yet

another member of plaintiff's family.  See Blansett

Pharmacal Co. Inc. v. Carmrick Laboratories Inc., 25 USPQ2d

1473, 1477 (TTAB 1992); and Econo-Travel Motor Hotel Corp.

v. Econ-O-Tel of America, Inc., 199 USPQ 307, 311-312 (TTAB

1978).

---

[8] Opposers did not plead a "family" of KILLER marks, mentioning
only the two individual KILLER MUSIC and design and KILLER TRACKS
marks, and referring throughout the pleading only to those two
marks as opposers' "KILLER Marks."  Applicant made no objection
on the basis that the issue was not pleaded.  It is clear from
the record that opposers' asserted "family" of KILLER marks was
tried by the parties.  Accordingly, opposers' notice of
opposition is hereby deemed amended to conform to the evidence in
accordance with Fed. R. Civ. P. 15(b) to include a claim of a
"family" of several KILLER marks.

19

Opposition No. 91152646

It is well settled that merely adopting, using and registering a group of marks having a feature in common for similar or related goods or services is insufficient to establish, as against a defendant, a claim of ownership of a family of marks characterized by the feature. Rather, it must be demonstrated that prior to defendant's first use of its challenged mark, the various marks said to constitute the plaintiff's family, or at least a good number of them, were used and promoted together in such a manner as to create among purchasers an association of common ownership based upon the family characteristic. See J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460, 18 USPQ2d 1889 (Fed. Cir. 1991); Witco Chemical Co. v. Whitfield Chemical Co., 418 F.2d 403, 164 USPQ 43 (CCPA 1969); Hester Industries Inc. v. Tyson Foods Inc., 2 USPQ2d 1646 (TTAB 1987); and Dan River, Inc. v. Apparel Unlimited, Inc., 226 USPQ 186 (TTAB 1985).

The problem with opposers' claim of a "family" of KILLER marks is that there is insufficient evidence showing use of these marks together as a "family" of marks prior to applicant's use of its KILLER SOUND and design mark in April 1999. The record shows that opposers have used the marks KILLER MUSIC since 1990, KILLER TRACKS since 1989, and KILLER LATINO since 1997. However, the dates of first use of several of opposers' other asserted "KILLER" marks are

20

Case 1:07-cv-08353-NRB    Document 5-2    Filed 03/20/2008    Page 49 of 58
Case 1:07-cv-08353-NRB    Document 1    Filed 09/25/2007    Page 47 of 56

Opposition No. 91152646

subsequent to applicant's proven first use of its mark.
For example, KILLER EDGE was first used in 1999, KILLER
PROMOS in 2000, KILLER ANIMATION in 2000, KILLER SCORES
around 2001, KILLER FX in 2001 or early 2002 and KILLER
SONIFER in 2002.   (Gross dep., pp. 25, and 67-69.)   While
there is some evidence of opposers' use of two or more
"KILLER" marks together, it is insufficient to establish a
"family" of KILLER marks recognized by the purchasing public
as all indicating source in opposers.   In addition, as
explained above, much of opposers' evidence of use of a
"family" of KILLER marks involves use subsequent to
applicant's first use of its mark.   Thus, we find that
opposers have not established a "family" of KILLER marks.

    Although opposers have otherwise relied on two
registered marks, in considering the
similarities/dissimilarities between applicant's mark KILLER
SOUND and design and opposers' KILLER MUSIC (and design) and
KILLER TRACKS (in typed form) marks, we will focus on
opposers' KILLER TRACKS mark.

    Our primary reviewing Court has held that in
articulating reasons for reaching a conclusion on the
question of likelihood of confusion, there is nothing
improper in stating that, for rational reasons, more or less
weight has been given to a particular feature or portion of
a mark.   That is, one feature of a mark may have more

21

Opposition No. 91152646

significance than another.  See Cunningham v. Laser Golf

Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); Sweats

Fashions Inc. v. Pannill Knitting Co., 833 F.2d 1560, 4

USPQ2d 1793, 1798 (Fed. Cir. 1987); and In re National Data

Corporation, 753 F.2d 1056, 224 USPQ 749, 752 (Fed. Cir.

1985).

    In this case, the word portion of applicant's mark is

KILLER SOUND, and opposers' mark is KILLER TRACKS.  Thus,

these marks share the dominant term KILLER.  Importantly,

both applicant's mark and opposers' mark begin with the same

first word, and it is often the first word that is most

memorable to consumers.  See Presto Products, Inc. v. Nice-

Pak Products, Inc., 9 USPQ2d 1895 (TTAB 1981).

    We acknowledge that the term "killer" may have a very

broad, general suggestive connotation in that it has a

dictionary meaning.  Specifically, we take judicial notice

of the following dictionary definitions of "killer":[9]

> (i)    "adjective: … 2. Slang  Having
>        impressive or effective power or
>        impact; formidable: had a killer
>        smile; made killer profits"  The
>        American Heritage Dictionary
>        (Fourth Edition 2000); and
>
> (ii)   "adjective. 1. strikingly
>        impressive or effective <a
>        killer smile> <a killer resumé>".

---

[9] See The University of Notre Dame du Lac v. J.C. Gourmet Food
Imports Co., Inc., 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d
1372, 217 USPQ 505 (Fed. Cir. 1983).  See also, TBMP §704.12 (2d
ed. rev. 2004).

Opposition No. 91152646

<u>Merriam-Webster's Online
Dictionary</u>.

This general connotation would be applicable to both applicant's and opposer BMG's marks.  Thus, applicant's mark connotes that its services (music composition) will result in the customer obtaining very impressive or "killer" sound. Likewise, with regard to opposers' mark, it connotes very

23

Opposition No. 91152646

impressive or "killer" soundtracks.  The second word in the
respective marks, "sound" and "tracks" have a similar
meaning in the context of the involved goods and services.
That is, the underscore of sound or music for a film, a
television show or a website, is generally known as a
"soundtrack."  We take judicial notice of the following
definition of the term "track" from The Random House
Dictionary (1987):  "…**14.** *Recording.* **a.** a band of recorded
sound laid along the length of a magnetic tape. … **d.** a
discrete, separate recording that is combined with other
parts of a musical recording to produce the final aural
version: *a special rhythm track added to the basic track.* …
**18.** soundtrack."  Applicant's argument regarding the many
meanings of the terms "sound" and "track" are not persuasive
because we must consider the connotations of words and
perceptions thereof by purchasers in the context of the
involved goods and services.  These marks, KILLER SOUND and
KILLER TRACKS, connote very similar meanings.

Clearly, we recognize that applicant's mark includes a
black and white circular or spiral design around the words
"killer·sound," while opposers' KILLER TRACKS mark is in
typed form only.  The design feature of applicant's mark is
not sufficient to obviate a finding of likelihood of
confusion.  The proper test in determining likelihood of
confusion is not on a side-by-side comparison of the marks,

24

Opposition No. 91152646

but rather must be on the recollection of the average
purchaser, who normally retains a general rather than
specific impression of the many trademarks encountered; that
is, a purchaser's fallibility of memory over a period of
time must also be kept in mind.  See Grandpa Pidgeon's of
Missouri, Inc. v. Borgsmiller, 477 F.2d 586, 177 USPQ 573
(CCPA 1973); and Spoons Restaurants Inc. v. Morrision, Inc.,
23 USPQ2d 1735 (TTAB 1991), aff'd unpub'd (Fed. Cir., June
5, 1992).  Importantly, when spoken, the design feature of
applicant's mark is not necessarily seen by the purchasers.
Even when seen by purchasers and potential purchasers, they
may mistakenly believe that applicant's mark is another
revised version of opposers' KILLER MUSIC and design and
KILLER TRACKS marks, with both parties' marks serving to
indicate origin in the same source.

    Although the parties' marks are certainly not
identical, when considered in their entireties, we find that
applicant's mark and opposers' registered KILLER TRACKS mark
are somewhat similar in appearance, and that they are
particularly similar in sound, connotation and commercial
impression.  See In re Azteca Restaurant Enterprises Inc.,
50 USPQ2d 1209 (TTAB 1999).  Their contemporaneous use, on
and in connection with the related goods and similar
services, would be likely to cause confusion as to the

Opposition No. 91152646

source or sponsorship of such goods and services.  See
Cunningham v. Laser Golf Corp., supra.

Another du Pont factor we consider in this case is the
fame of opposers' mark KILLER TRACKS.  "Fame of an opposer's
mark or marks, if it exists, plays a 'dominant role in the
process of balancing the DuPont factors.'"  Bose Corp. v.
QSC Audio Products, Inc., 293 F.3d 1367, 63 USPQ2d 1303
(Fed. Cir. 2002), quoting Recot Inc. v. M.C. Becton, 214
F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000).  See also,
Kenner Parker Toys Inc. v. Rose Art Industries Inc., 963
F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992).

Opposers have used this mark for over ten years.  They
have experienced "steady growth" (Gross dep., p 34),
generating over $52.5 million in sales for the goods and
services sold under the KILLER TRACKS mark in the last ten
years.  Advertising for these goods and services under the
KILLER TRACKS mark amounted to over $300,000 - $350,000 per
year during that time frame.  The record shows that opposers
have received extensive media coverage, including stories
about opposers and their mark KILLER TRACKS, reviews which
include the music credit to KILLER TRACKS, etc.  This
coverage includes extensive coverage in the media production
trade and industries, which are one type of relevant
consumers of the goods and services involved herein, as well

26

Opposition No. 91152646

as in general consumer media.   (Opposers' Notice of Reliance
under Trademark Rule 2.122(e), exhibit A.)

Based on this record, we conclude that opposers have
demonstrated the mark KILLER TRACKS is famous, and is thus
entitled to a broad scope of protection.   See Bose
Corporation v. QSC Audio Products, Inc., 293, F.3d 1367, 63
USPQ2d 1303 (Fed. Cir. 2002).[10]

The fame of opposer BMG's KILLER TRACKS mark plays a
dominant role in the du Pont factor analysis.   Indeed, the
fame of this mark increases the likelihood that consumers
will believe that applicant's services emanate from or are
sponsored by or are associated with opposers.

Applicant argues, under its heading "The Number Of
Similar Marks In Use With Similar Goods," that the existence
of third-party registrations which include the word "KILLER"
in the mark and which are for similar or related goods and
services supports a finding of lack of confusion.   (Brief,
pp. 15-16.)   In support thereof, applicant submitted its
notice of reliance under Trademark Rule 2.122(e) on five
third-party registrations and one third-party application.

---

[10] Applicant argued that there is no direct evidence of consumer
recognition and commented that opposer "failed to submit customer
testimony or a single consumer survey to demonstrate the
purported strength of their marks."   (Brief, p. 9.)   This
argument is unpersuasive as neither customer testimony nor
consumer surveys are necessary to establish fame or the strength
of the mark.   See Bose v. QSC, supra; and Hilson Research v.
Society for Human Resource Management, 27 USPQ2d 1423, 1435-1436
(TTAB 1993).

Opposition No. 91152646

The third-party application carries no weight as it is
evidence only that the application was filed on a particular
date.  The five third-party registrations submitted by
applicant are likewise totally devoid of evidentiary value
with regard to this du Pont factor because third-party
registrations do not establish that the marks shown therein
are in use, or that the public is familiar with them.  See
Olde Tyme Foods Inc. v. Roundy's Inc., 961 F.2d 200, 22
USPQ2d 1542, 1545 (Fed. Cir. 1992); and Helene Curtis
Industries Inc. v. Suave Shoe Corp., 13 USPQ2d 1618 (TTAB
1989).  There is no evidence before us of any use by any
third-party of any mark including the word "KILLER" for the
same or related goods or services.

Regarding the du Pont factor of "the nature and extent
of any actual confusion," the only evidence thereon is from
applicant, whose witness testified about one instance of
actual confusion and three inquiries regarding whether there
was an affiliation between applicant and opposers.  (Gelat
dep., pp. 101-106.)  Opposers' witness testified that he was
not directly aware of any instance of actual confusion.
(Gross dep., pp. 93-94.)

Applicant argues in its brief that there is an absence
of any "credible instance of actual confusion"; and that the
few instances about which applicant's witness testified are
de minimis, particularly in light of applicant's 20,000 hits

28

Opposition No. 91152646

per month on its website and its 75-100 telephone and e-mail
inquiries each month.

We agree with applicant that there is not evidence of
significant numbers of customers or potential customers
actually confused regarding the involved marks for the
involved goods and services. However, in light of the co-
existence of the parties' respective marks for only about
five years, we find that this factor is neutral. Moreover,
the test is not actual confusion, but likelihood of
confusion. See Gillette Canada Inc. v. Ranir Corp., 23
USPQ2d 1768, 1774 (TTAB 1992). Even if this factor were
found to favor applicant, it is outweighed by the other du
Pont factors in this case which favor opposers.[11]

On balance, and considering all of the evidence on the
relevant du Pont factors, and giving each such factor its
appropriate weight in the circumstances of this case, we
find that there is a likelihood that the purchasing public
would be confused when applicant uses KILLER SOUND and
design as a mark for its services.

While we have no doubt in this case, if there were any
doubt on the question of likelihood of confusion, it must be
resolved against applicant who is the newcomer, as the
newcomer has the opportunity of avoiding confusion, and is
obligated to do so. See TBC Corp. v. Holsa Inc., 126 F.3d

29

Opposition No. 91152646

1470, 44 USPQ2d 1315 (Fed. Cir. 1997); and In re Hyper

Shoppes (Ohio) Inc., 837 F.2d 840, 6 USPQ2d 1025 (Fed. Cir.

1988).

    **Decision:**   The opposition is sustained.

---

[11] We specifically note that we do not find that the evidence
establishes that potential confusion would be de minimis.

30